# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE MAR 1 3 2014

*Madsen C.J.*
CHIEF JUSTICE

This opinion was filed for record
at _8:00 a.m._ on _March 13, 2014_

Ronald R. Carpenter
Supreme Court Clerk

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 87472-7 |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| TIMOTHY JOHN DOBBS aka TIMOTHY JOHN ST. LOUIS, | ) | |
| | ) | |
| Petitioner. | ) | |
| | ) | |
| In the Matter of the Personal Restraint of | ) | |
| | ) | |
| TIMOTHY J. DOBBS, | ) | |
| | ) | Filed   MAR 1 3 2014 |
| Petitioner. | ) | |

OWENS, J. -- Under the Sixth Amendment to the United States Constitution, criminal defendants have the right to confront the witnesses against them. However, if the defendant intentionally *causes* the absence of a witness from trial, he or she forfeits that right. As the esteemed Justice Tom Chambers wrote, "[W]e will not allow [the defendant] to complain that he was unable to confront [the witness] when [the defendant] bears responsibility for [the witness's] unavailability." *State v.*

*Mason*, 160 Wn.2d 910, 925, 162 P.3d 396 (2007). Without such a forfeiture rule, defendants would have "an intolerable incentive . . . to bribe, intimidate, or even kill witnesses against them." *Giles v. California*, 554 U.S. 353, 365, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008).

In this case, Timothy John Dobbs engaged in a campaign of threats, harassment, and intimidation against his ex-girlfriend, C.R., that included a drive-by shooting at her home and warnings that she would "'get it'" for calling the police and she would "regret it" if she pressed charges against him. 1 Verbatim Report of Proceedings (VRP) at 97, 123. As C.R. reported the increasingly violent activities of Dobbs against her, she explained to the police that she was terrified that she was going to wind up dead. After Dobbs was arrested, he made yet another intimidating phone call to C.R., threatening that if she went forward and pressed charges against him, she would regret it. When C.R. failed to show up to testify at trial, the trial judge found that there was clear, cogent, and convincing evidence that Dobbs was the cause of her absence and thus had forfeited his confrontation right. We agree. While Dobbs has the right to confront witnesses against him, he forfeited his right to confront C.R. when he chose to threaten her with violence for cooperating with the legal system. "To permit the defendant to profit from such conduct would be contrary to public policy, common sense and the underlying purpose of the confrontation clause." *United States v. Carlson*, 547 F.2d 1346, 1359 (8th Cir. 1976).

## FACTS

The criminal charges in this case arose out of an escalating series of violent and threatening actions Dobbs took against C.R. shortly after the end of their relationship. On November 7, 2009, police were dispatched to C.R.'s residence in response to a domestic violence report shortly before 5:00 a.m. C.R. explained to the police officer that Dobbs had been following her and threatening to shoot her if she would not let him be her boyfriend anymore. C.R. indicated that Dobbs had just been at her residence beating on her door, wanting to come in. After they argued and she told him to leave, she heard a hissing noise outside and found that her tires had been slashed.

While the police officer was at her residence, C.R. received text messages and a phone call. She explained to the officer that they were from Dobbs, and she put the call on speakerphone so the officer could hear. The caller argued with C.R. about why she had called the police on him, reminded her that he had warned her about calling the police, and ended the call by telling her that she was going to "'get it.'" 1 VRP at 97. C.R. told the officer that she believed Dobbs would hurt her, based on the earlier threats to shoot her and the fact that she knew he had a gun. She told the officer that Dobbs had told her that he was going to come back and shoot her house and everyone there.

On November 10, 2009, C.R. called James Applebury, her cousin's fiancée who lived in a house on the same property as C.R.'s residence. She told him that Dobbs was leaving and wanted to know if Applebury could confirm that Dobbs was gone. Applebury went to the window and saw a man resembling Dobbs in a car similar to one that he had seen Dobbs in previously. Shortly thereafter, the car pulled into the alley next to the property and Applebury heard gunshots from the alley. Applebury called the police, as did C.R., who reported that Dobbs had been stalking her and that he had recently been at her house. The officers who responded to the call found C.R. extremely fearful and upset. She told them that if Dobbs was not found, they were going to find her dead. The police later examined the outside of C.R.'s residence and found recent bullet holes. Based on the trajectory of the bullet holes, the police concluded that they came from the nearby alley. C.R. later played for police a voice mail from Dobbs that she received after the shooting. The police reported that the voice mail basically said, "'You heard that. That was me and that's what I can do.'" *Id.* at 123.

Later that same evening, Applebury's fiancée told him that Dobbs was back on the property. Applebury called the police and while he was talking to the dispatcher, C.R. ran into the house, screaming that Dobbs had a gun. Applebury looked across the yard through the open door to C.R.'s residence and saw Dobbs inside holding a gun. Dobbs then fled, jumping over the fence into the neighbor's yard. With the

assistance of a K-9 unit, police tracked Dobbs to a nearby Laundromat, where he was arrested. The next morning, C.R.'s neighbor found a handgun in his yard and turned it over to the police.

When the police spoke with C.R. shortly after Dobbs had fled from her home, they reported that she was hysterical, upset, and fearful. She told them that Dobbs had been harassing and stalking her for two weeks. She explained that earlier that evening, he had pushed his way inside her residence and that he had a gun. She told the police, "'I told you . . . you were going to find me dead.'" *Id.* at 116. She also gave the police a note that Dobbs had left behind earlier that day that one of the police officers read into the record at trial:

> "Last days. The countdown on your . . . ass. You should know me by now, Casey. You fucked up and tripped with . . . the wrong brother. You will regret what . . . you did and said to me. You never loved me. You never cared about me and now you will reap a world of trouble and pain. Number 1, you can apologize to me and talk with me face-to-face or Number 2, you know you can't and won't be (inaudible) here in Longview or Washington. I'm going all out on this with you. You're fucked up, bitch."

*Id.* at 120.

The following day, the police spoke with C.R. again and she played a voice mail that she had received from Dobbs from jail the night after he had been arrested. The police described the voice mail as Dobbs "essentially pleading with her not to go forward and not to press charges against him and it -- it kind of quickly turned into kind of a threatening of don't do this to me or -- or you'll regret it." *Id.* at 123.

5

C.R. also showed the police two text messages that she received the day of the shooting. The police photographed the messages and then read them aloud at trial. The first one said, "'Next time it is you, bitch. On, Bloods.'" *Id.* at 126. The second one said, "'Bitch, you move and there will be hell to pay. Plus, my bro lives down there and he's a known figure. You can't get away from me. I told you you're mines (sic).'" *Id.* at 126-27.

Prosecutors charged Dobbs with eight crimes, including stalking, harassment, and drive-by shooting. The bench trial began on January 25, 2010. C.R. was served with a subpoena, and the night before trial, an officer went to C.R.'s house to remind her to come to court the following morning to testify. The officer reported that C.R. responded "'Okay'" and closed the door. *Id.* at 106. C.R. did not appear at trial the next day. Prosecutors and police attempted to contact her over the next couple of days but were unable to reach her. The judge eventually issued a formal warrant for C.R.'s arrest but she was not located and never appeared at trial.

The State asked the court to rule that Dobbs could not raise the issue of his confrontation rights because he had forfeited those rights by engaging in wrongdoing with the intent to prevent C.R. from testifying. The court agreed, ruling:

> Clear, cogent and convincing evidence. I'm satisfied that there is a sufficient basis that the defendant's conduct is the fact to why she is not here. There is testimony that she felt he was -- the defendant was following her. She knew he carried a weapon. Others had seen a black handgun. She had threatened to -- he had threatened to shoot her in the past, if she wouldn't let him be her boyfriend. She said she was

receiving text messages calling her names. There is evidence that -- I'm deciding this by clear, cogent and convincing evidence. I have not decided this case based upon beyond a reasonable doubt. So, that should be emphasized. There is the -- she believed it was the defendant that punctured her tires. She said she believed the defendant would -- he would hurt her because of what she had said in the -- because of what he had said in the past, she believed he would shoot her. He had a handgun. So, I think that based upon the evidence that is in front of this Court, it is clear, cogent and convincing that she was afraid of him and that's why she isn't here to testify. And, that based on that evidence, he does forfeit the right to object on the confrontation issues, not as to the basis for any hearsay.

2 VRP at 255-56.

The trial court then addressed whether the forfeiture of one's confrontation rights also waives one's hearsay objections. The court ruled that under *State v. Fallentine*, 149 Wn. App. 614, 215 P.3d 945 (2009), "there is also a waiver of hearsay objections if the Court finds forfeiture by wrongdoing." 2 VRP at 282.

The judge found Dobbs guilty of (1) stalking (domestic violence) with a deadly weapon enhancement, (2) felony harassment (domestic violence), (3) intimidating a witness (domestic violence), (4) drive-by shooting (domestic violence), (5) first degree unlawful possession of a firearm, and (6) obstructing a law enforcement officer.

Dobbs appealed and the Court of Appeals affirmed, holding that there was sufficient evidence that Dobbs intentionally engaged in misconduct to keep C.R. from testifying, including telling her she would die if she continued to cooperate with the police and then later, after he was arrested, threatening that she would regret it if she

proceeded to press charges. *State v. Dobbs*, 167 Wn. App. 905, 914-15, 276 P.3d 324 (2012). The Court of Appeals also held that the trial judge did not err in admitting evidence that would have been inadmissible as hearsay but for the doctrine of forfeiture by wrongdoing. *Id.* at 917-18. The Court of Appeals concluded that under the same reasoning underlying the forfeiture of wrongdoing, a defendant waives his hearsay objections when his actions make it necessary for the State to rely on out-of-court statements. *Id.* at 918. We granted Dobbs's subsequent petition for review. *State v. Dobbs*, 175 Wn.2d 1013, 287 P.3d 10 (2012).

## ISSUES

1. Did substantial evidence support the trial judge's ruling that Dobbs had caused C.R.'s absence and thus forfeited his right to confront her?

2. If Dobbs forfeited his confrontation right by wrongdoing, did he also waive any hearsay objections he might have?

## STANDARD OF REVIEW

Constitutional issues, such as the potential violations of the Sixth Amendment right to confront witnesses, are subject to de novo review. *State v. Price*, 158 Wn.2d 630, 638-39, 146 P.3d 1183 (2006). We review a trial court's findings of fact to determine whether they are supported by substantial evidence. *State v. Hill*, 123 Wn.2d 641, 644-47, 870 P.2d 313 (1994). We review trial court decisions on the admissibility of evidence for abuse of discretion. *State v. Powell*, 126 Wn.2d 244,

258, 893 P.2d 615 (1995). A trial court abuses its discretion when its decision "is manifestly unreasonable or based upon untenable grounds or reasons." *Id.*

## ANALYSIS

1. *Substantial Evidence Supported the Trial Judge's Ruling That Dobbs Had Caused C.R.'s Absence and Thus Forfeited His Right to Confront Her*

The Sixth Amendment gives criminal defendants the right to confront the witnesses against them.[1] However, a criminal defendant forfeits this right when he or she causes the witness to be unavailable. *Mason*, 160 Wn.2d at 925. This rule—known as the forfeiture by wrongdoing doctrine—"permit[s] the introduction of statements of a witness who was 'detained' or 'kept away' by the 'means or procurement' of the defendant." *Giles*, 554 U.S. at 359.

In Washington, we first adopted the forfeiture by wrongdoing doctrine in *Mason*. 160 Wn.2d at 925. We explained that the doctrine is grounded in the principle of equity, and that a defendant cannot complain of his inability to confront a witness when his own actions caused that witness to be unavailable. *Id.* at 925-26. We held that when a trial court is faced with a potential forfeiture by wrongdoing, "the trial court must decide whether the witness has been made unavailable by the

---

[1] Article I, section 22 of the Washington State Constitution similarly provides a criminal defendant with the right "to meet witnesses against him face to face." Because the parties do not argue that the state constitution provides stronger confrontation rights than the federal constitution, we do not engage in that analysis. *Mason*, 160 Wn.2d at 917 n.1.

9

wrongdoing of the accused based upon evidence that is clear, cogent, and convincing." *Id.* at 927.

In *Mason*, we also held that "[s]pecific intent to prevent testimony is unnecessary" and that "[k]nowledge that the foreseeable consequences of one's actions include a witness' unavailability at trial is adequate to conclude a forfeiture of confrontation rights." *Id.* at 926. However, the United States Supreme Court later explained that the forfeiture by wrongdoing doctrine is limited to those situations where the defendant engaged in the conduct with the intention to prevent the witness from testifying. *Giles*, 554 U.S. at 361.

Reading *Mason* and *Giles* together, we conclude that a defendant forfeits the Sixth Amendment right to confront a witness when clear, cogent, and convincing evidence shows that the witness has been made unavailable by the wrongdoing of the defendant, and that the defendant engaged in the wrongful conduct with the intention to prevent the witness from testifying.

When the standard of proof is clear, cogent, and convincing evidence, the fact at issue must be shown to be "highly probable." *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973). In this case, we hold that the State has established Dobbs's pattern of abuse and intimidation towards C.R. and shown it is highly probable that these violent threats—which Dobbs explicitly and directly connected to her decisions to call the police and press charges—were the cause of her absence at trial. The trial

judge's finding of fact that there was clear, cogent, and convincing evidence that Dobbs was the cause of C.R.'s absence is supported by substantial evidence in the record.

First, we review the evidence. We know that Dobbs had been stalking and threatening C.R. with violence, including threats to shoot her. We know that C.R. knew Dobbs had a gun and was terrified that he was going to kill her. She told police that if they did not find Dobbs soon, they were going to find her dead. We know that after Dobbs threatened to shoot her house and everyone in it, he partially followed through on that threat by shooting at her residence, showing C.R. very clearly that he was not making idle threats. We know that once C.R. chose to report Dobbs to the police, Dobbs began harassing her about that decision and warned her that she was going to "'get it.'" 1 VRP at 97. We know that Dobbs left a note with C.R. telling her that she would "'reap a world of trouble and pain.'" *Id.* at 120. We know that C.R. received a text the day of the shooting that warned her that she would not be safe even if she moved, telling her that "'my bro lives down there and he's a known figure'" and "'[y]ou can't get away from me.'" *Id.* at 126-27. And we know that after he shot at C.R.'s house, he returned with a gun *again* and forced his way into her residence. We know that C.R. was forced to run from her own home, screaming for help. After Dobbs was finally apprehended that evening, we know that he called C.R. from jail and left a voice mail pleading with her not to press charges. The police

officer who listened to the voice mail recalled that it "quickly turned into kind of a threatening of don't do this to me or -- or you'll regret it." *Id.* at 123.

Taken together, these facts show that Dobbs was armed, consistently threatened C.R. if she cooperated with the police, and followed through on these threats by showing up at her house with a gun on multiple occasions, once even shooting at it. Any rational individual would fear testifying against such a person. And indeed, C.R. was terrified of Dobbs. She knew he carried a gun, and she knew his threats were escalating. She told police over and over that she was scared that Dobbs was going to kill her. And Dobbs specifically threatened her from jail, warning her not to press charges. The only purpose such a threat could have would be to intimidate C.R. into not participating in the criminal proceedings against Dobbs. The trial judge reviewed the evidence and made a finding of fact that there was clear, cogent, and convincing evidence that Dobbs's violence and intimidation aimed at C.R. was the cause of her decision against testifying against him at trial. Based on our review of the record, we find that his decision was supported by substantial evidence.

We recognize that because we did not formally adopt the forfeiture by wrongdoing doctrine until 2007, there is little precedent to guide trial courts. In this case, the trial judge relied on *Fallentine*, a Court of Appeals case from 2009 and one of the only Washington cases to address forfeiture due to witness intimidation. He concluded that "this case . . . has a stronger basis than I think the *Falentine* [sic]

decision." 2 VRP at 282. We agree that the evidence in this case is even stronger than the evidence in *Fallentine*, where the Court of Appeals dismissed a confrontation challenge.

In *Fallentine*, both Anthony Clark and Conrad Fallentine were charged in connection with an arson and burglary. 149 Wn. App. at 618. Clark admitted committing the arson with Fallentine and pleaded guilty, but he later refused to testify against Fallentine. *Id.* The State then sought to introduce the testimony of a social worker who met with Clark. She testified that Clark had told her that he was afraid of Fallentine, that he knew Fallentine carried a firearm, and that he believed Fallentine or his associates would retaliate against him for "'roll[ing] over' on Fallentine." *Id.* at 621-22 (alteration in original).

However, when the court held a hearing to determine why Clark refused to testify, Clark recanted. *Id.* at 622. He denied that he was frightened and spoke favorably of Fallentine, saying he was "'like a brother'" and "'didn't do the arson.'" *Id.* The social worker testified again to Fallentine's earlier statements of fear, and this time testified that Clark had claimed that Fallentine threatened to "'put a hit'" out on him if he testified. *Id.* at 622-23. There was no other evidence of any threat to Clark, and the social worker also testified that Clark did not want to "'rat . . . out'" Fallentine and "did not want to be seen as a snitch inside the jail 'on top of everything else.'" *Id.*

The Court of Appeals held that the evidence showed that Fallentine intentionally prevented Clark from testifying. *Id.* at 623.

We find the evidence in this case to be even stronger. In contrast to Clark, who directly denied that his fear of Fallentine was the reason he refused to testify, we have no such disavowal from C.R., who remained silent. Also, unlike here, where Dobbs's menacing conduct was directly observed by multiple witnesses and left a trail of text messages, voice mails, and bullet holes, there was no independent evidence to verify that Fallentine prevented Clark from testifying. The evidence supporting this proposition consisted only of Clark's hearsay statements to the investigator and social worker. *Id.* at 618, 621-23. Even this was somewhat diluted by the fact that Clark also told the social worker that he did not want to be seen as a snitch inside the jail, suggesting a different motive for his changing story. *Id.* at 622-23. But despite Clark's direct denial that his refusal to testify was caused by Fallentine and the indications that Clark had other potential motives, the court saw through the charade and held that there was clear, cogent, and convincing evidence that Clark's failure to testify was caused by Fallentine. *Id.* at 616, 623.

Admittedly, in this case we do not have a direct statement from C.R. stating that she feared Dobbs would kill her specifically as a result of her testifying. But that is the nature of the forfeiture by wrongdoing doctrine, where witnesses are scared into silence. We cannot and do not require a direct statement from the witness who is

intimidated into silence because such a requirement would exclude almost all absent witnesses' testimony, regardless of evidence of witness intimidation. The only situation in which such testimony would be admitted is where the witness comes forward and identifies the defendant's actions as the reason for refusing to testify. This would be an extreme and inappropriately high bar because, by definition, a witness who was intimidated into silence will not come forward to say as much.

Here, we do have a police officer's testimony regarding the voice mail C.R. received from Dobbs in jail where he warned that she should not press charges or she would "regret it." 1 VRP at 123. The only purpose for such a threat was to intimidate C.R. into not participating in the criminal proceedings against Dobbs. And it is highly probable that this threat was successful. Just because C.R. did not spell out exactly what type of cooperation with law enforcement she feared would cause Dobbs to follow through on his death threats does not mean they did not have their intended effect. C.R. repeatedly expressed terror of Dobbs and what he would do. She had seen Dobbs follow through on his threats before when he fired bullets into her house, and it is highly probable that she feared the consequences of testifying against him. C.R. should not have to spell out for the court what is obvious to any rational observer: she was afraid Dobbs would again follow through on his threats if she testified, perhaps to a much more dangerous extent. Every one of Dobbs's threatening text messages, voice mails, and uninvited appearances made it less rational for C.R. to

risk her life to testify and more likely that Dobbs would succeed in preventing her from doing so. There is simply too much evidence here of Dobbs's violence to avoid the conclusion that it is highly probable that he succeeded in his repeated efforts to deter C.R. and keep her away from the stand.

Forfeiture by wrongdoing requires clear, cogent, and convincing evidence. It does not require a showing beyond a reasonable doubt. A court does not need to rule out all possibilities for a witness's absence; it needs only to find that it is highly probable that the defendant intentionally caused it. Here, all of the evidence points to that conclusion. The trial court entered a finding of fact that clear, cogent, and convincing evidence showed that Dobbs caused C.R.'s absence from court. The court then ruled that, as a result, Dobbs forfeited his right to confront C.R. We hold that the trial court's finding of fact was supported by substantial evidence and the legal standard was properly applied.

2. When Dobbs Forfeited His Confrontation Right by Wrongdoing, He Waived His Hearsay Objections

The trial court and the Court of Appeals held that when Dobbs forfeited his confrontation rights by wrongdoing, he also waived his hearsay objections. We agree. As the United State Supreme Court has observed, "'[I]t seems apparent that the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stem from the same roots." *Giles*, 554 U.S. at 365 (quoting *Dutton v. Evans*, 400 U.S. 74, 86, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970)). Both are designed to protect against the dangers of

using out-of-court statements as proof. But when the defendant's actions *are the reason* that the State must rely on out-of-court statements, he is hardly in a position to complain about the use of those out-of-court statements, whether through an assertion of confrontation rights or a hearsay objection. For the same reasoning that underlies the forfeiture by wrongdoing doctrine, we hold that a defendant who procures a witness's absence waives his hearsay objections to that witness's out-of-court statements.

In *Giles*, the United States Supreme Court underwent a thorough review of the history behind the forfeiture by wrongdoing doctrine. 554 U.S. at 358-69. The Court found that "[n]o case or treatise that we have found . . . suggested that a defendant who committed wrongdoing forfeited his confrontation rights but not his hearsay rights." *Id.* at 365. The Court went on to comment that "the distinction would have been a surprising one, because courts prior to the founding excluded hearsay evidence in large part *because* it was unconfronted." *Id.* The majority of courts have agreed with the Supreme Court's conclusion. *See United States v. White*, 325 U.S. App. D.C. 282, 116 F.3d 903, 912 (1997). Indeed, when considering whether forfeiture of confrontation rights also waives one's hearsay objections, we find it reasonable to conclude that "[t]he same equity and policy considerations apply with even more force to a rule of evidence without constitutional weight." *Id.* at 913. If such wrongdoing did not result in a waiver of hearsay objections, a defendant would have a

perverse incentive to use threats, intimidation, or violence to prevent a witness from

coming to court.[2] Such an outcome defies common sense.

CONCLUSION

Those in the best position to protect the survivors of domestic violence are the

survivors themselves. We find that it is highly likely that C.R. chose to protect herself

by refusing to testify against Dobbs. By threatening C.R. with violence for

cooperating with the police and pressing charges, Dobbs attempted to prevent her

from testifying. We will not reward him for his success in bringing about that result.

We hold that he has forfeited his confrontation rights and hearsay objections through

his wrongdoing. We affirm the Court of Appeals.

---

[2] We note that this rule, already adopted by the majority of the courts who have addressed it and adopted by this court in this opinion, has also recently been codified in Washington's Rules of Evidence effective September 1, 2013. *See* ER 804(b)(6) (including in the list of hearsay exceptions "[a] statement offered against a party that has engaged directly or indirectly in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.").

WE CONCUR:

_Owens, J._

_Stephens, C.J._

_Johnson, J._

_Fairhurst, J._

_Gonzalez, J._

_Madsen, C.J._

No. 87472-7

WIGGINS, J. (dissenting)—As part of Timothy John Dobbs's two-week campaign of harassing and stalking C.R., Dobbs warned C.R. not to call the police. Despite these threats, C.R. called the police after Dobbs pounded on her door and slashed her tires.

Three days later, Dobbs apparently fired several shots into C.R.'s residence. Despite Dobbs's threats not to call the police, C.R. again called the police. Later that same evening, C.R. ran to her neighbor's house screaming that Dobbs was present and had a gun. The neighbor called police and C.R. told the police about Dobbs's threats and her fear that he would kill her.

The police apprehended and jailed Dobbs. The next night Dobbs called from the jail and left a voice mail pleading with her not to go forward with charges and threatening her if she proceeded. Despite Dobbs's threats, C.R. played the voice message for the police and showed them two threatening text messages he had sent a few days earlier.

There is no evidence of any other threats by Dobbs against C.R. for the next two months, while Dobbs was confined in jail. Thus, before Dobbs was arrested and jailed, C.R. repeatedly reported Dobbs's threats and attacks to police. Two months later, without any further known threats by Dobbs and while Dobbs was still jailed, C.R. failed to attend his trial.

I.     The state did not provide clear, cogent, and convincing evidence that Dobbs caused C.R.'s absence at trial

The majority concludes that these facts clearly, cogently, and convincingly prove that Dobbs's actions caused C.R.'s absence at trial. But the majority's conclusion is mere speculation in light of the multiple plausible theories for C.R.'s nonappearance. It is certainly possible that Dobbs's phone call and voice message to C.R., along with his earlier acts of intimidation and harassment, dissuaded C.R. from testifying. However, it is also quite possible that she had some other motive: if the situation with Dobbs calmed after November 10, she may have decided she did not want him to be convicted. She may also have been intimidated by the prospect of appearing in court, or may have had a personal distaste for cooperating with law enforcement once the original threat had dissipated. As early as November 17 she was not showing up for appointments at the police station, and no evidence suggested it was because she was afraid. We do not know what occurred in the months between her sworn statement to police on November 10 and her absence from trial on January 25 to change C.R.'s perspective (even assuming she ever intended to testify); we can only speculate. Where the evidence supports multiple inferences as to the cause of a witness's failure to appear, we cannot conclude that the evidence of causation is clear, cogent, and convincing. *See Wilkie* v. *Simonson,* 51 Wn.2d 875, 877-78, 322 P.2d 870 (1958) (where evidence adduced sustains two equally plausible theories, the party with the burden of proof has failed to meet its burden).

Indeed, to reach its conclusion, the majority overlooks the remarkable dearth of evidence connecting Dobbs's actions to C.R.'s nonappearance. None of the officers or civilian witnesses who were in contact with C.R. leading up to the trial offered any evidence on whether C.R. had mentioned a plan not to appear, or offered any reasons why C.R. might not appear. Officers contacted C.R. several times after the incident on November 10. And notably, Officer Michael Headley spoke with her the night before the start of trial, and C.R. assured Headley that she would be at trial. Civilian witnesses James Applebury and Sarah Ellis lived next to C.R. throughout this period.[1] They both offered testimony to support the charges, but neither offered any evidence to explain why C.R. declined to appear.

The majority's conclusion is not only speculative, it is counterintuitive. Dobbs's threats did not prevent C.R. from contacting police before he was arrested and jailed. The majority concludes somewhat implausibly that once behind bars, Dobbs somehow instilled such a fear in C.R. so as to prevent her from testifying at the very trial that would ensure her continued safety by placing Dobbs behind bars for a considerable period of time.

Under the majority's analysis, every defendant who threatens a witness not to contact police or to testify automatically forfeits the right to cross-examine the witness. The majority authorizes a court to admit the witness's prior statements about the crime without any evidentiary support that the threats caused the witness' absence. Indeed, that is what happened here. The State presented evidence of threats, which had never before prevented C.R. from contacting the police and

---

[1] James Applebury is C.R.'s landlord and Sarah Ellis is C.R.'s neighbor.

accusing Dobbs; the trial court concluded that the threats caused C.R.'s absence from trial; and the majority affirms without requiring evidence that Dobbs's threats caused the absence. The majority's reasoning is summarized by its assertion, "While Dobbs has the right to confront witnesses against him, he forfeited his right to confront C.R. *when he chose to threaten her with violence for cooperating with the legal system*." Majority at 2 (emphasis added). Although the majority later acknowledges that the doctrine of forfeiture by wrongdoing requires proof that the defendant "causes the witness to be unavailable," *id.* at 9, the majority fails to find that proof in this case.

The clear, cogent, and convincing standard of evidence is deliberately difficult: it does not permit courts to assume a link between a defendant's wrongful behavior and a witness's absence where there may be none. To allow such a weak showing to become Washington's standard for "clear, cogent, and convincing" would swallow the rule of confrontation. Indeed, it is difficult to imagine a domestic violence case that would not involve threats or action designed to cause fear in the recipient. Accordingly, the State should at least be required to produce more evidence than was presented here.

Not only does the majority fail to find proof of causation, it finds little support in the leading cases, *State v. Mason*, 160 Wn.2d 910, 162 P.3d 396 (2007), and *Giles v. California*, 554 U.S. 353, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008). In both *Mason* and *Giles*, the evidence unequivocally established that the defendant prevented the witness from testifying—in both cases the defendant silenced the witnesses by murder. Even in the face of such clarity, we noted that "'a defendant's

4

loss of the valued Sixth Amendment confrontation right constitutes a substantial deprivation.'" *Mason*, 160 Wn.2d at 926 (quoting *People v. Geraci*, 85 N.Y.2d 359, 367, 649 N.E.2d 817, 625 N.Y.S.2d 469 (1995)). This loss is a danger we refused to take lightly: although the defendant may find other avenues to challenge an incriminating statement's veracity, the Sixth Amendment enshrines the proposition that none approaches the effectiveness of cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 61-62, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) ("The [Confrontation] Clause thus reflects a judgment . . . about how reliability can best be determined.").

These cases additionally demonstrate that we are concerned about a bootstrapping phenomenon peculiar to this context sometimes called "reflexive forfeiture." Establishing forfeiture by wrongdoing requires a preliminary finding of fact that the defendant's wrongful conduct prevented the witness's testimony. *Mason*, 160 Wn.2d at 926. This, by itself, is not unusual: evidentiary questions frequently require a judge to make crucial pretrial findings pursuant to ER 104. *Id.* However, "the issue of forfeiture by wrongdoing is unique in that the trial judge must often rule on the *ultimate question*: [e.g.,] did the accused kill the alleged victim?" *Id.* (emphasis added). Indeed, that was the case here because the trial judge had to determine whether Dobbs had committed stalking, felony harassment, and intimidating a witness to decide whether those same acts had procured C.R.'s absence. In this way, establishing forfeiture sometimes requires presupposition of the very guilt the defendant sought to challenge through confrontation, thus ensnaring him or her in a circular trap. Any time a set of unconfronted, extrajudicial

5

statements tend both to incriminate the defendant and establish grounds for forfeiture, that defendant could lose any opportunity to challenge their accuracy and truthfulness through cross-examination.

To guard against these dangers, we held that to establish forfeiture, the prosecution must provide clear, cogent, and convincing evidence that the defendant intended to prevent the witness from testifying, and that the defendant's wrongful conduct actually caused the witness's nonappearance. *Id.* at 926-27. While acknowledging that conventional pretrial decisions are typically made on a preponderance of the evidence, we concluded that in this context, "the stakes are simply too high to be left to a mere preponderance standard." *Id.*[2]

In short, our case law makes clear that "the right of confrontation should not be easily deemed forfeited by an accused." *Id.* at 927. When we articulate the "clear, cogent, and convincing" standard, this court is commenting on the degree of confidence the trier of fact should have in the correctness of its factual conclusions, rather than requiring a certain level of statistical probability. *In re Det. of Brooks*, 145 Wn.2d 275, 297, 36 P.3d 1034 (2001), *overruled on other grounds by In re Det. of Thorell*, 149 Wn.2d 724, 72 P.3d 708 (2003). This formulation properly reflects the fact that probability with respect to the standard of proof is a measure of the subjective belief of the trier of fact. We require a high degree of confidence under

---

[2] Although Washington's use of the clear, cogent, and convincing standard is more exacting than the preponderance of evidence required by a majority of jurisdictions, *see Mason*, 160 Wn.2d at 926-27, this formulation of the forfeiture inquiry is not unique. The United States Court of Appeals for the Fourth Circuit, for instance, permits forfeiture of the confrontation right only where "'(1) the defendant engaged or acquiesced in wrongdoing (2) that was intended to render the declarant unavailable as a witness and (3) that did, in fact, render the declarant unavailable as a witness.'" *United States v. Dinkins*, 691 F.3d 358, 383 (4th Cir. 2012) (quoting *United State v. Gray*, 405 F.3d 227, 241 (4th Cir. 2005)).

the "clear, cogent, and convincing" standard, which falls just short of "beyond a reasonable doubt," the category reflecting the highest degree of certainty. While the evidence in this case is sufficient to prove by a preponderance of the evidence that Dobbs caused C.R.'s failure to appear, it fails to rise to the required level of clear, cogent, and convincing evidence.

Nor does the majority derive support from *State v. Fallentine*, 149 Wn. App. 614, 618, 215 P.3d 945 (2009), in which witness Anthony Clark made statements to an investigator implicating the defendant, Fallentine, in an arson. Clark and Fallentine were both charged with the arson. Clark later pleaded guilty, but refused to testify against Fallentine at trial, despite being ordered by the trial judge to testify. Clark, who was apparently a juvenile, explained to his social worker that he did not want to "'have to look over [his] shoulder all the time'" and that Fallentine had threatened to "'put a hit'" on him if he testified. *Id.* at 622-23. Moreover, there was evidence that Clark had low self-esteem; was a "'follower'"; did not want to return to foster care under any circumstances; and was motivated to have an ongoing relationship with his sister and Fallentine, even though he was afraid of Fallentine. *Id.* at 621. After Clark's first interview with the arson investigator, the social worker said Clark told her that Fallentine carried a firearm and was dangerous, Clark felt he could not get away from Fallentine, and he was worried what would happen if Fallentine found him. After Clark's second recorded interview with the investigator, he appeared "'frightened, hypervigilant and somewhat paranoid.'" *Id.* at 621-22. The social worker found Clark on the floor in a fetal position, sobbing. *Id.* On this basis, the court was persuaded that Fallentine's threats were the reason Clark refused to

appear in court. *Id.* at 623. The court of appeals affirmed, reasoning, "Viewed in the light most favorable to the State, the evidence shows Fallentine told Clark if Clark testified against him, he would be killed, and that threat actually prevented Clark from testifying." *Id.* (footnote omitted).

Contrary to the majority, I would find that the evidence that Fallentine's threats caused Clark not to testify was much stronger than the evidence that Dobbs's threats caused C.R. not to testify. Here, the State adduced no direct evidence of causation and offered only circumstantial evidence. The circumstantial evidence showed a pattern of abuse giving rise to general fear but failed to connect that fear to C.R.'s decision not to testify. We simply do not know why C.R. failed to appear, and to conclude otherwise on these facts would permit a virtual presumption of forfeiture any time a witness fails to appear after a defendant's threatening or violent behavior.

The majority rightly sympathizes with the injustice inherent in domestic violence situations and rightly seeks to protect C.R. and others from Dobbs. Intimate partner abuse is endemic in this State: nearly one in five women experience injury from their partner and almost one-half of all female homicide victims perish at the hands of their current or former partner. LILLIAN BENSELY, WASH. STATE DEP'T OF HEALTH, HEALTH OF WASHINGTON: DOMESTIC VIOLENCE (2004) (updated 2013). These issues must be taken seriously. However, we cannot allow a difficult case to vitiate this court's role as the guardian guarantor of constitutional protections. The majority eviscerates the constitutional rights of many in order to punish one, building bad law on bad facts.

8

II. The erroneous admission of C.R.'s unconfronted testimony was not harmless beyond a reasonable doubt.

Because I would find a violation of the confrontation clause, I analyze whether the conviction should be reversed due to the error, or whether the error was harmless, in which case the conviction may stand.

A violation of the confrontation clause at trial is harmless only if the State can show "'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *State v. Jasper*, 174 Wn.2d 96, 117, 271 P.3d 876 (2012) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). By contrast, if the conviction is nonetheless supported by "'overwhelming untainted evidence,'" we deem the confrontation clause error harmless. *Mason*, 160 Wn.2d at 927 (quoting *State v. Davis*, 154 Wn.2d 291, 305, 111 P.3d 844 (2005)).

Here, I would find that the trial court's admission of C.R.'s statements was not harmless beyond a reasonable doubt with respect to Dobbs's convictions for stalking, felony harassment, or intimidating a witness. Each of these convictions was heavily supported by C.R.'s unconfronted testimony. In both of her sworn written statements to police, C.R. complained that Dobbs had been making death threats and harassing her for two weeks. This evidence would carry substantial weight with a trier of fact supporting the charges of stalking and felony harassment. And C.R. identified a threatening voice mail from a man she identified as Dobbs urging her not to testify—evidence supporting the intimidating a witness charge. Witness James Applebury's untainted testimony may have helped corroborate some of these

statements from C.R. but falls short of providing overwhelming independent support for these three convictions.

Dobbs's conviction for drive-by shooting presents a closer question, but here too I am unable to conclude, beyond a reasonable doubt, that C.R.'s statements did not at least contribute to the verdict. Applebury's testimony might, by itself, have been sufficient to establish the conviction. Applebury testified that he saw a car he recognized as Dobbs's pull into the alley and then heard and saw gunshots coming from the alley. This occurred, according to Applebury, almost immediately after he saw someone he believed was Dobbs leaving the vicinity of C.R.'s apartment. And a trajectory analysis of two nearby bullet holes corroborated his account. However, C.R.'s sworn statement from November 10 identified Dobbs as the shooter even more unambiguously: "he got angry & shot 2x at my garage where there is [sic] 2 bullet holes . . . ." Pl.'s Ex. 37. And her earlier sworn statement on November 7 relayed his previous threats to shoot her. I cannot conclude, beyond a reasonable doubt, that the trier of fact would have found Dobbs guilty of drive-by shooting in the absence of C.R.'s unconfronted statements.

By contrast, the admission of C.R.'s statements was harmless beyond a reasonable doubt with respect to Dobbs's convictions for unlawful possession of a firearm and obstruction of a law enforcement officer. The conviction for unlawful possession of a firearm required the State to prove both that Dobbs had a previous conviction for a serious offense and that he was subsequently in possession of a firearm. See RCW 9.41.040(1)(a). Dobbs has such a previous conviction (attempted robbery in the first degree), and Applebury testified that he directly observed Dobbs

10

with a handgun on the evening of November 10. Finally, Dobbs's conviction for obstructing a law enforcement officer is not based on C.R.'s statements at all, but rather on Officer Nicholas Woodard's account that Dobbs fled after being ordered to halt.

When evidence admitted at trial is later found to violate the confrontation clause, remand for retrial is the appropriate remedy. *Jasper*, 174 Wn.2d at 120. Therefore, because C.R.'s unconfronted statements may have contributed to them, Dobbs's convictions for stalking, felony harassment, intimidating a witness, and drive-by shooting should be reversed and retried.

To conclude, a defendant's Sixth Amendment confrontation right is forfeited only upon clear, cogent, and convincing evidence that (1) the defendant acted with specific intent to procure the witness's absence and (2) the defendant's wrongful conduct is the actual cause of that witness's absence. I would hold that Dobbs did not forfeit his right to confront C.R. C.R.'s unconfronted, extrajudicial statements to police were therefore admitted in violation of Dobbs's Sixth Amendment rights. This error was of a constitutional dimension, and I cannot conclude that it was harmless beyond a reasonable doubt. Thus, I would reverse the Court of Appeals and remand for retrial on the charges of stalking, felony harassment, intimidating a witness, and drive-by shooting.

I dissent.

Wiggins, J.

Gordon McCloud, J.

Madsen, C. J.