# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| | ) | |
| Respondent, | ) | No. 72411-8-I |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| JENARO DE JESUS HERNANDEZ, | ) | |
| | ) | |
| Appellant. | ) | FILED: February 16, 2016 |
| | ) | |

DWYER, J. — Two principles control the decision in this case. First, under the doctrine of forfeiture by wrongdoing a defendant forfeits his Sixth Amendment right to confront a witness against him when clear, cogent, and convincing evidence demonstrates that he engaged in wrongdoing that was designed to, and did, procure the unavailability of the witness at trial. Second, when a defendant forfeits his Sixth Amendment right of confrontation by wrongdoing, he also forfeits his right to interpose hearsay objections to the same evidence. In this case, involving allegations of sex crimes committed upon Y.C., a child, by Jenaro Hernandez, the trial court correctly ruled that Hernandez engaged in wrongdoing—with Olga, Y.C.'s mother as his co-conspirator[1]—that was designed to, and did, procure the unavailability of Y.C., Olga, and Y.C.'s brother at trial. The trial court, thus, correctly ruled that Hernandez had forfeited his Sixth Amendment right to confront any of these witnesses. Additionally, because

---

[1] For clarity, we refer to Y.C.'s mother by her first name, Olga.

Hernandez forfeited his Sixth Amendment right of confrontation, he also forfeited the right to interpose hearsay objections to Y.C.'s testimony, including an objection pursuant to RCW 9A.44.120, the child hearsay statute. Accordingly, we affirm.

I

On November 21, 2013, eight-year-old Y.C. approached her teacher in the classroom at her school. Y.C. told her teacher that "this hurts," while pointing to her genital area. When Y.C.'s teacher asked why it was hurting, Y.C. responded "[m]y stepdad." Y.C.'s teacher then asked if it had been going on for a while, and Y.C. responded "yes."

Y.C.'s teacher left her classroom in the care of a student teacher and immediately escorted Y.C. to the nurse's office. Upon arrival, Y.C's teacher located the school nurse and the school psychologist. Y.C.'s teacher informed them that "we may have an issue of abuse here, sexual abuse." While in the nurse's office, Y.C. explained—in the presence of her teacher, the nurse, and the psychologist—that the alleged sexual contact with her "stepdad" began when she was six years old and recounted the details to them. Following this conversation with Y.C., the psychologist wrote a report and telephoned both the police and Child Protective Services.

Later that same day, Y.C. was taken to the Swedish Mill Creek emergency department by a foster care representative. She was there examined by a forensic nurse. During that examination, Y.C. identified her "stepdad,"

Hernandez, as the man who had sex with her.[2] Y.C. also, once again, recounted the details of her alleged sexual contact with Hernandez.

In the days following Y.C.'s initial report at school, Y.C. was interviewed by a child interview specialist at the request of law enforcement. Olga and Y.C.'s brother also spoke with Detective Karen Kowalchyk of the Everett Police Department about the instances of alleged sexual contact between Hernandez and Y.C.

Ultimately, the State charged Hernandez by twice amended information with three counts of rape of a child in the first degree, three counts of child molestation in the first degree, and one count of tampering with a witness. He pleaded not guilty to all counts.

On June 3, 2014, the defense filed a motion to compel witness interviews with Y.C. and Olga. Two days later, the parties appeared before the trial judge to address preliminary matters. Defense counsel orally moved to compel interviews with the intended witnesses.

> MS. LOPEZ DE ARRIAGA [Defense Counsel]: We had interviews scheduled today at 2:30 of the alleged victim and her mother. It's my understanding from counsel that those are not going to go forward. I can't defend my client effectively, Your Honor, without that interview. I'm here asking the Court to compel the State to produce the witnesses for interview.
>
> THE COURT: Do you have any objection?
>
> MR. ALSDORF [Prosecutor]: I don't really see a way I can object, but I would like to explain the state of affairs, if that's okay, if I could by way of [an] offer of proof.

---

[2] The record indicates that Hernandez was actually Olga's boyfriend.

THE COURT: Go ahead.

MR. ALSDORF: It came to my attention, perhaps about a month ago now, a few weeks ago anyway, that [Y.C.], the victim in this case, had stopped attending school. When Child Protective Services went to investigate why she was no longer coming to school, they went to her apartment and found that the apartment had been completely moved out of. No sign of anyone residing there.

Who should have been resid[ing] there is [Y.C.], her older brother, [M.C.], and [Y.C.'s] mother, all three of whom would be witnesses if they were available.

I had Detective Kowalchyk investigate the matter. Her efforts included contacting co-workers of [Y.C.'s] mother at her place of employment. They confirmed that [Y.C.'s] mother had also stopped attending her job. Further, that they had heard from her by telephone, and that [Y.C.'s] mother was indicating over the telephone that she had taken [Y.C.] and herself to Mexico specifically to avoid all of the appointments, I think, related to this case and this investigation.

So that's our understanding of where [Y.C.] and her mother and her brother are is in Mexico. Although I certainly acknowledge the State has some obligation to make diligent efforts to put our witnesses in contact with the defense for an interview, I think that those efforts can't really extend into Mexico for all practical purposes.

. . . .

So I guess that's my way of saying [that] I intend to proceed in this case without the live testimony of [Y.C.], her mother, or her brother.

The trial court then ordered "the State to make reasonable and diligent efforts to locate and produce those witnesses." In so ordering, the trial judge noted that, "I think that's all the Court can do and all that the State is responsible to do."

Following this ruling, the State continued its efforts to procure the presence of the intended witnesses at trial. These efforts were later outlined in an affidavit that was attested to by the prosecutor and in the State's trial

- 4 -

memorandum as detailed offers of proof to the trial court. The record indicates that the State's efforts included having Detective Kowalchyk contact Olga's employer, co-workers, and several of her family members. Olga's brother provided Kowalchyk with a private telephone number in Mexico, from which he had received a call from Olga. The State's affidavit detailed that when Kowalchyk utilized an interpreter to call the telephone number provided by Olga's brother, "[o]n the third attempt a young woman answered, who claimed to not know who Olga was and that it must be a wrong number. This woman assertively told the interpreter to never call back again."

In addition to making these telephone calls, the affidavit explained that "the State obtained copies of the audio recordings of all of the defendant's jail phone calls" and arranged to have them translated from Spanish into English. A preliminary examination of the call log was "concerning" to the State, given that it evidenced that "the defendant ha[d] placed 142 calls to Olga's cell phone number since the Court ordered him not to have contact with any [of the] State's witnesses. Since that time the defendant ha[d] also placed 16 calls to the land line associated with Olga and [Y.C.'s] now-vacant apartment."

Finally, the affidavit detailed that the prosecutor "asked Detective Kowalchyk to investigate whether corroborative evidence exist[ed] to prove exactly when Olga, [Y.C.], and [Y.C.'s brother], purchased tickets to travel by bus to Mexico, and when they crossed the border." In effectuating this request, Kowalchyk contacted the Greyhound bus company and law enforcement officials

who were familiar with the border between the United States and Mexico.[3]

On June 23 and 24, the court held a hearing to determine the admissibility of certain statements made by Y.C., Olga, and Y.C.'s brother. After hearing testimony and the argument of counsel, the trial court found that statements made by Y.C., Olga, and Y.C.'s brother were admissible pursuant to the forfeiture by wrongdoing doctrine and that certain of Y.C.'s statements were admissible pursuant to the child hearsay statute, RCW 9A.44.120.[4]

A trial was held and the jury found Hernandez guilty on each count. He was sentenced to an indeterminate sentence ranging from a minimum of 318 months of confinement to a maximum term of life in prison. He now appeals.

II

Hernandez contends that the trial court erred by concluding that certain statements made by Y.C., Olga, and Y.C.'s brother were admissible under the forfeiture by wrongdoing doctrine. This is so, he asserts, both because the "State did not satisfy the 'wrongdoing' requirement,"[5] and because the witnesses were not "unavailable" as evidenced by "the State['s] fail[ure] to engage in reasonable, good faith efforts to secure the witnesses' presence at trial."[6] We disagree.

"The Sixth Amendment provides that '[i]n all criminal prosecutions, the

---

[3] The record indicates that, when the intended witnesses were still in the United States, the State's efforts to procure their presence at trial included having a prosecutor and a victim witness advocate meet with Y.C. and Olga. In addition, after receiving notification that the intended witnesses may have been in Mexico, the State mailed subpoenas to their last known address.

[4] The trial judge did make a redaction to one of Olga's statements. He declined to admit what he deemed to be a "very speculative" statement that was uttered by Olga about Hernandez's alleged desire to touch Y.C.

[5] Br. of Appellant at 20.

[6] Br. of Appellant at 1, 17.

accused shall enjoy the right . . . to be confronted with the witnesses against him.'" State v. Koslowski, 166 Wn.2d 409, 417, 209 P.3d 479 (2009) (alterations in original) (quoting U.S. CONST. amend. VI). "[T]he Sixth Amendment's right of an accused to confront the witnesses against him . . . is made obligatory on the States by the Fourteenth Amendment." Pointer v. Texas, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).[7]

The right of confrontation has been "'most naturally read'" as "'admitting only those exceptions established at the time of the founding.'" Giles v. California, 554 U.S. 353, 358, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008) (quoting Crawford v. Washington, 541 U.S. 36, 54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)). Under one such exception, the forfeiture by wrongdoing doctrine, "defendants who are responsible for a witness' unavailability at trial forfeit their right to confront the missing witness." State v. Mason, 160 Wn.2d 910, 924, 162 P.3d 396 (2007). Forfeiture occurs "when clear, cogent, and convincing evidence shows that the witness has been made unavailable by the wrongdoing of the defendant and that the defendant engaged in the wrongful conduct with the intention to prevent the witness from testifying." State v. Dobbs, 180 Wn.2d 1, 11, 320 P.3d 705 (2014).[8] "'To permit the defendant to profit from such conduct

---

[7] "Article I, section 22 of the Washington Constitution also guarantees criminal defendants the right to confront and cross-examine witnesses against them. However, as [the defendant] made no arguments based on the state constitution, we do not address the state constitution here." State v. Ohlson, 162 Wn.2d 1, 10 n.1, 168 P.3d 1273 (2007).

[8] We review legal issues arising out of the Sixth Amendment's confrontation clause de novo. Koslowski, 166 Wn.2d at 417. When we review factual findings that must be proved by clear, cogent, and convincing evidence, as here, "the fact at issue must be shown to be 'highly probable.'" Dobbs, 180 Wn.2d at 11 (quoting In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)); Mason, 160 Wn.2d at 926-27 (declining to adopt a preponderance of the

would be contrary to public policy, common sense and the underlying purpose of the confrontation clause.'" Dobbs, 180 Wn.2d at 5 (quoting United States v. Carlson, 547 F.2d 1346, 1359 (8th Cir. 1976)).

A

Hernandez first asserts that the State failed to demonstrate that he engaged in wrongdoing. We disagree.

The forfeiture doctrine's application is not limited to direct acts of wrongdoing by a defendant. Giles, 554 U.S. at 359-61. Indeed, it includes instances where a defendant "uses an intermediary for the purpose of making a witness absent." Giles, 554 U.S. at 360. In addition, it is not limited to acts of wrongdoing that are procured by means of violence. Dobbs, 180 Wn.2d at 4 (noting that "[w]ithout such a forfeiture rule, defendants would have 'an intolerable incentive . . . to bribe, intimidate, or even kill witnesses against them'" (emphasis added) (alteration in original)) (quoting Giles, 554 U.S. at 365).

In ruling on the motion in limine, the trial judge made a factual determination that Hernandez engaged in wrongdoing by analyzing several recorded jailhouse telephone calls.

> The series of calls that I've reviewed are an effort by [the] defendant to get [Y.C.], Olga, and [Y.C.'s brother] out of the country. They are used in code which is so rudimentary that it does not require a code breaker to understand what is going on here. It

---

evidence standard of proof); In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986) ("[W]here the State must prove its case by clear, cogent and convincing evidence, the evidence must be more substantial than in the ordinary civil case in which proof need only be by a preponderance of the evidence, in other words, the findings must be supported by substantial evidence in light of the 'highly probable' test." (citation omitted)).

- 8 -

is not speculation to understand that the words "goats" and "herd" refer to the children. "Shepherd" refers to Olga. "Movies" refers to Mexico. "Chocolate" refers to cash. He knows this, he knows he's being recorded, and he makes these references in code that Olga understands in order to manipulate her and to have the effort to get her out of the country established.

The code, as I said, there's no speculation on anybody's part if you read the transcripts as to what's -- what this means and how she responds.

I reject the idea that Olga initiated this. She did not. And I'll get to the transcript. On page 128 of the transcript, in fact, that's clear to me that she did not. If you look at 128, you will see the following exchange:

[Hernandez]: "Hello."

Olga says, "Hello."

[Hernandez]: "Hello, love."

Olga: "Hello, love."

[Hernandez]: "What are you doing?"

"I'm just watching TV," says Olga. "I'm sitting here watching TV."

That conversation is initiated by [Hernandez] and not by Olga. Then goes on. He says, "Olga, I love you. I have to tell you something, but you are going to need to take it not too bad." He goes on to say that, "I'm going to tell you something, but you have to digest it slowly." And then he says, "I don't think what we had planned is going to work." Implying that there was a plan between the two of them.

[Olga]: "Why?"

[Hernandez]: "Because I was talking to my cousin. The flock has got to get -- the flock has to leave, all sheep."

Which is a euphemism for the family.

[Olga]: "What?"

[Hernandez]: "All the sheep have to get out of the pen. Do you understand?"

She says, "So so."

[Hernandez]: "I mean they have to go from one field to the other." Continuing with the agricultural euphemisms.

[Olga]: "Yes, love."

[Hernandez] says, "It's going to be difficult like this because if the flock stays out of the pen, I don't know what will happen really, and I don't want anything bad to happen that's why they have to leave the pen and go [to] another field."

And she says, "All the way to where we talked about?" Implying that Olga knows, of course, where they're going.

[Hernandez]: "Yeah, love. And I'll give you ten chocolates so you can take the flock with you."

Now, there's no evidence before me that this was an agricultural family that owned sheep or goats or had pens or that they were fine diners on chocolates. So I could assume, perhaps, that this would have other meanings. They're euphemisms.

She says, "I don't want to leave."

And then he says, "Me neither. But that's the worst. But don't say it like that. I don't want to take the flock away from here. But, anyway, it has to be done because one way or the other over here, they will look for the flock, and they will take it away from you, and I don't want that."

And her response, "I don't want that either."

That is a clear statement of their plan; a clear statement of the motivation; and a clear statement, in my mind, of what [Hernandez] wants her to do and how he is manipulating her with cash.[9]

They go on to say on page 423 of section 128: "There's an option. It's risky. You have to do it anyway. It's already a mess," and so forth.

The transcripts that I read are replete with this kind of communication between [Hernandez] and Olga, designed to get Olga, [Y.C.], and [Y.C.'s brother] out of the country. And it's designed based upon what the defendant knows about Olga and that she's easily manipulated, she's afraid, and that she's overwhelmed.

And if I look -- as I look at the evidence rule, it has nothing to do with the person who is trying to be – who the defendant is trying

---

9 The record indicates that in a transcript of one conversation Hernandez and Olga discussed the plan to go to Mexico without the use of coded language:
Olga – Should I go to Mexico with the kids?
[Hernandez] – Eh?
Olga – Should I go to Mexico with the kids?
[Hernandez] – If you do it, you should do it as soon as possible.
Olga – That's what I'm telling you. I think it would be easier, no?
[Hernandez] – Yeah. But if you do that you should decide it right away, before trial.
Olga – That's why I'm saying.
[Hernandez] – And then come back in two years.
Olga – If I leave, no no, no . . . How can I say it? If I come back later, what's going to happen?
[Hernandez] – I think they would free me. I don't really know what would happen with that.

. . . .

Olga – But then you can go to trial and even win it.
[Hernandez] – If that happens, I would win the trial for sure . . . But we cannot talk about that over the phone, my love.

to move out of the country, it has to do with the defendant's actions that we primarily look at. Are his actions designed to have the witness secreted and prevent them from testifying?[10]

The mention of chocolates, certainly euphemism, as I said, for cash. The statement made to the third party about research essentially asking what happens if the victim and the other witnesses are here, what are my odds, so to speak, and I paraphrase.[11] That's contained there. Certainly goes to a scheme or plan on part of the defendant.

So looking at that, looking at the [State v.]Dobbs case,[12] then, it's clear to me by clear, cogent, and convincing evidence that Mr. Hernandez has engaged in activity specifically designed to prevent the witnesses -- Olga, [Y.C.], and [Y.C.'s brother] -- from testifying.

Based on the trial judge's explanation of his ruling, it is evident that the trial judge concluded that Hernandez's use of coded language was an effort to conspire with Olga to take the children to Mexico in advance of his trial date. The

---

[10] The trial judge was referring to ER 804(b)(6). This rule creates an exception to the rule against hearsay, provided that the declarant is unavailable as a witness, and the statement that is sought to be admitted is "[a] statement offered against a party that has engaged directly or indirectly in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."

[11] The record indicates that in a transcript of one conversation with the unidentified male, Hernandez made the following request:

[Hernandez] – I want you to do some research for me, man.
Male – Okay.
[Hernandez] – Suppose that they are accusing you . . . I am accusing you of . . .
Shooting at me.
Male – Mmmm
[Hernandez] – Okay, so I go to Mexico, I run off to Mexico . . . you are accusing me, no, I am accusing you of shooting at me, and so I get you in jail. So, I am the only witness, and if I go to Mexico, what would happen to you? Would they let you go free?
Male – Mmmm . . . I don't know, man.
[Hernandez] – Look that up for me, man. I need you to look it up for me because something could free me from all this mess. And that's good . . . that I go to Mexico, and you go free . . . that would be free, no?
Male – Yes, without the witness. . .
[Hernandez] – Without the victim.
. . . .
[Hernandez] – Yes, I need you to do that research because . . . Like I tell you, I want to go to Mexico, and because I don't want to be in jail; maybe they can let you go out . . . and that's what I think, and so if it'll help me, I'll do that business, man.

[12] 180 Wn.2d 1.

coded language, when coupled with Hernandez's request of an unidentified male to conduct research about the law regarding his probability of success if a victim was not present to testify at trial, evidenced intentional acts by Hernandez that were designed to procure the unavailability of a key witness—the victim, Y.C.[13] The trial judge was in the best position to make the determination that Hernandez engaged in wrongdoing. He did so thoroughly, thoughtfully, and with reference to the correct legal standard. There was no error.

### B

Hernandez next asserts that the trial court erred by concluding that the witnesses were rendered unavailable. Again, we disagree.

"The Sixth Amendment requires a demonstration of unavailability when the declarant witness is not produced." State v. Ryan, 103 Wn.2d 165, 170, 691 P.2d 197 (1984). "Unavailability means that the proponent is not presently able to obtain a confrontable witness' testimony." Ryan, 103 Wn.2d at 171.

"A witness may not be deemed unavailable unless the prosecution has made a good faith effort to obtain the witness' presence at trial." Ryan, 103 Wn.2d at 170-71 (citing Barber v. Page, 390 U.S. 719, 88 S. Ct. 1318, 20 L. Ed. 2d 255 (1968)).

> "[T]he lengths to which the prosecution must go to produce the witness is 'a question of reasonableness.'" [State v.]Smith, 148 Wn.2d [122,] 133, [59 P.3d 74 (2002)] (internal quotation marks omitted) (quoting [Ohio v.]Roberts, 448 U.S. [56,] 74, [100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), abrogated on other grounds by Crawford, 541 U.S. 36]). In particular, the "good faith" standard

---

[13] Indeed, the absence of three potential witnesses was procured: Y.C., Olga, and Y.C.'s brother.

does not require the State to undertake a "futile act" to satisfy the confrontation clause. Ryan, 103 Wn.2d at 172 (citing Roberts, 448 U.S. at 74). However, if the State makes no effort whatsoever to produce the witness, the State cannot rely on the mere possibility that the witness would resist such efforts.

State v. Beadle, 173 Wn.2d 97, 113, 265 P.3d 863 (2011). The burden of proving unavailability lies with the proponent of the hearsay statement. Beadle, 173 Wn.2d at 112.

Here, the State obtained recordings of numerous jailhouse telephone calls between Hernandez and Olga, and between Hernandez and an unidentified male. It had a Spanish-language interpreter listen to these recordings and transcribe them into English. From a reading of these transcripts, the State was able to establish that Hernandez and Olga acted in concert in developing and implementing a plan to take the children to Mexico in order to ensure Y.C.'s unavailability at trial. Olga's role as a co-conspirator gave the State, and later the court, insight into what efforts would be reasonable in an attempt to procure Y.C.'s presence at trial.

In this context, with the knowledge that Olga was a co-conspirator in the effort to keep Y.C. away from the trial—and given that Y.C. was under Olga's control and custody—the State's efforts to procure Y.C.'s presence at trial included speaking with Olga's employer, co-workers, and family members. The detective obtained a telephone number from Olga's brother and, with the aid of an interpreter, called the telephone number on three separate occasions. On the last occasion, the only occasion on which a call was answered, the interpreter was directed by the call's recipient not to call again. It was reasonable for the

State to infer that the woman who answered the telephone was either Olga herself or someone who was aware of the conspiracy to keep Y.C. away from the trial and that any further efforts to make contact would be futile.

In ruling on whether Y.C. was unavailable at trial—given the State's offer of proof regarding its efforts—the trial judge acknowledged that the joint efforts of Hernandez and Olga "makes unavailable not only Olga and [M.C.], the brother, and the mother of [Y.C.], but [Y.C.] herself. That's the key reason why she is not here. And that clearly is a fact these three parties are not here." Ultimately, the trial judge made a factual determination that "the physical fact that [Y.C.], her mother, and her brother are now in Mexico, which we all know that to be the fact, makes her, per se, unavailable."

Given the trial judge's explanation of his ruling, he clearly concluded that the State's efforts of speaking with Olga's employer, co-workers, and family members, obtaining a private telephone number in Mexico, and utilizing an interpreter to make three separate telephone calls constituted a reasonable response to Olga's flight to Mexico with the children in tow. Moreover, given that Olga and Hernandez were intimately involved in a conspiracy to keep Y.C. away from the trial by causing her to move to Mexico, the State was not presented with a situation akin to attempting to procure the presence of an adult victim at trial. Instead, the trial judge recognized that the State was charged with the task of attempting to change the mind of an adult co-conspirator in order to procure the return to this country and the presence of a child victim for testimony at trial. In this regard, the trial judge reasonably concluded that, given that Y.C. was under

the control and custody of Olga, the State's efforts were circumscribed by Olga's role as a co-conspirator. The trial judge was in the best position to make the determination that Y.C., Olga, and Y.C.'s brother were made unavailable *due to* the efforts of Olga and Hernandez, and that nothing more the State could reasonably have done would have had the foreseeable effect of encouraging Olga to change her mind and return to the United States with Y.C. for Hernandez's trial. The trial judge ruled thoroughly, thoughtfully, and on the record before him. There was no error.[14]

III

Finally, Hernandez contends that the trial court erred by admitting certain statements made by Y.C. pursuant to RCW 9A.44.120, the child hearsay statute. We need not evaluate this claim because Hernandez forfeited his right to interpose such an objection.

In State v. Dobbs, 180 Wn.2d at 16-17, the court addressed whether an individual who forfeits his or her right to confrontation by wrongdoing also forfeits the right to assert hearsay objections to the same evidence. The court held that this is so, explaining that, "when the defendant's actions *are the reason* that the State must rely on out-of-court statements, he is hardly in a position to complain

---

[14] In his brief, Hernandez argues that the additional step of sending a "letter to the mother's address would have demonstrated at least minimal effort on the part of the State" to procure Y.C.'s presence at trial. Reply Br. of Appellant at 8. Hernandez made no such suggestion to the trial court. Instead, he offers this suggestion to us for the first time on appeal. Unsurprisingly, Hernandez points to nothing in the record that would indicate that such an act would have been anything other than a futile act. The State was not required to engage in futile acts in order to satisfy its burden of proof on the question. Beadle, 173 Wn.2d at 113.

about the use of those out-of-court statements, whether through an assertion of confrontation rights or a hearsay objection." Dobbs, 180 Wn.2d at 16.

Because Hernandez forfeited his Sixth Amendment right of confrontation by engaging in wrongdoing, he also forfeited his right to interpose hearsay objections to the same evidence.

Affirmed.

We concur: