IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31909-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TASHIA STUART, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Tashia Stuart appeals her convictions for the aggravated first

degree murder of her mother and an earlier attempt to murder her, arguing the trial court

erred when it admitted testimony from family and friends that her mother expressed fear

before her death that Tashia[1] and Tashia's husband might be trying to kill her. The

statements were not testimonial, so the confrontation clause of the Sixth Amendment to

the United States Constitution does not apply. We question whether the forfeiture by

wrongdoing exception to the hearsay rule ever applies to a defendant on trial for the

---

[1] Given the large cast of characters, we refer to Tashia and Todd Stuart by their first names for clarity. We intend no disrespect.

speaker's murder, but defer that decision to another day. Tashia's convictions can be affirmed on the basis of harmless error.

Since we affirm the convictions, we do not address the State's cross appeal of the court's suppression of certain evidence. We affirm a small sanction imposed on the prosecutor.

We refuse to consider a challenge to the imposition of legal financial obligations raised for the first time on appeal, but exercise our discretion to deny the State costs on appeal.

## FACTS AND PROCEDURAL BACKGROUND

In January 2011, Judy Hebert allowed her daughter Tashia Stuart, Tashia's husband Todd Stuart, and Tashia's seven-year-old daughter to move into her Pasco home. In the weeks leading up to March 3, 2011, when Ms. Hebert was fatally shot, Ms. Hebert expressed concern to several friends and her ex-husband, Tashia's father, that Tashia and Todd were trying to kill her. The following statements and events were eventually offered as evidence that Ms. Hebert had the concern and that her concern might have been reasonable.

On February 20, 2011, Todd asked Ms. Hebert to help him take measurements of the floor of her garage so that he could build a wall. Handing her a measuring tape, he asked her to back up until he told her to stop. As she stood at the point where he told her

2

to stop, an 18-gallon tub filled with books fell from a floored area on the rafters above her, hitting her on the head and knocking her to the ground.

Tashia quickly called her father, Rolfe Hebert. While Mr. Hebert and Ms. Hebert were divorced, they remained friendly. Tashia told Mr. Hebert there had been an accident, her mother was hurt, and she needed the combination to Ms. Hebert's safe to retrieve her mother's "do not resuscitate" order and her will. Mr. Hebert answered, "[Y]ou don't need any of that stuff. You need to hang up and dial 911." Report of Proceedings (RP) at 1696.[2] When Tashia answered, "[M]om won't let me," Mr. Hebert told her to put her mother on the phone. Asked what happened, Ms. Hebert told her ex-husband, "[I]t's the damndest thing," and explained how Todd had been directing her with the measuring tape when the tub fell and struck her. *Id.* She told him that the blow "smashed her to the concrete," and she felt "really beat up" but did not think she needed medical attention. *Id.*

Tashia called her father again twice that day, continuing to request the combination to her mother's safe. He refused to provide it even after Tashia told him, "[M]om told me everything in that safe is mine anyway." RP at 1699. He answered, "[T]hen get the combination from mom," ending the discussion. *Id.*

---

[2] Seven transcripts, separately paginated, are included in our record. The largest begins with an August 22, 2012 hearing and continues with most of the record of the one-month trial. We refer to pages of that transcript as the Report of Proceedings (RP). References to any of the six other transcripts are date-specific, e.g., RP (Nov. 1, 2012).

Shortly after the tub fall accident, Tashia spoke with Charles Adney, an ex-boyfriend and the father of her daughter. She asked if he would be willing to witness a forged will (Ms. Hebert's) for $1,000. She said she wanted to make sure Todd did not inherit anything from her mother. According to Mr. Adney, she told him, "[T]hat bitch should be dead in a few days. . . . I dropped something on her head" and she is "bleeding out of her eyes and her nose." RP at 1489, 1491. He said Tashia also "kind of made a joke," telling him, "Take it from me, if you drop something on somebody's head, make sure it's round instead of flat." RP at 1489.

Ms. Hebert became suspicious that the tub might not have fallen by accident, and perhaps Tashia had been on the partially-floored rafters above Ms. Hebert and pushed it. Several of Ms. Hebert's friends talked with her in the weeks before her death about her suspicion and her fear of Tashia and Todd.

Ms. Hebert expressed concern to neighbor Deborah Severin about her safety and asked Ms. Severin to check in with her on Mondays if Tashia and Todd were at her home on the weekend. She told Ms. Severin "if something ever happened to [me], they did it." RP at 732. At Ms. Severin's suggestion, the two came up with a "code word," "[l]avender," that Ms. Hebert would use if she wanted Ms. Severin to call the police but was not free to say so. *Id.*

Ms. Hebert told Ryan Rhodes, another neighbor, about how Todd led her out to the garage and positioned her under the rafters so that Tashia could push the tub of books

4

to fall on her. Ms. Hebert told Mr. Rhodes that "she felt that they were planning something and that if she wasn't at the house for any period of time that they probably buried her out in the backyard." RP at 900.

A third neighbor, Tonya Amende, spoke with Ms. Hebert about her injury from the falling tub, including on the day before Ms. Hebert died. On that last occasion, Ms. Hebert told Ms. Amende she had drawn a diagram of the garage, depicting where she and Todd were standing when the tub fell, and that she had taken pictures of the top of the pickup truck and the top of the rafters because it looked like someone had been on top of both. She told Ms. Amende she had put the drawing and the photos in her safe. Finally, she told Ms. Amende she feared Tashia and Todd were "messing with her medication." RP at 484.

Toni Capaul, Ms. Hebert's friend and banker, testified that Ms. Hebert called her the day before her death to report abnormal activity in her bank account, identifying two ATM withdrawals and a retail purchase. She asked Ms. Capaul to cancel her debit card and issue a new one. During the conversation, Ms. Hebert told Ms. Capaul about being injured by a tub of books falling from the rafters of the garage. She told Ms. Capaul, "I think Todd is trying to kill me." RP at 315.

Ms. Hebert spoke to her ex-husband about her suspicion of Tashia and Todd. She expressed concerns about her medications, telling Mr. Hebert, "[I]f I didn't know better,

5

I'd think they're trying to kill me." RP at 1703. She also told him there had been unauthorized withdrawals from her account.

On the day of Ms. Hebert's murder, at around lunch time, Tashia called her father and asked, "[I]f mom comes at me what do I do?" RP at 1714. Mr. Hebert answered, "[I]f you and mom are having problems, leave the house. . . . [M]om can barely walk and she can't raise her arms above her head, how is she going to come after you?" RP at 1714-15.

A couple of hours later, around 2:25 p.m., Franklin County Sheriff's dispatch received a 911 hang up call from Ms. Hebert's residence. When dispatch called the number back, a woman answered and stated the fire alarm had gone off in the house, that she was changing the battery, and that there was no problem.

At around the same time, Mr. Rhodes, the neighbor, heard gunshots coming from Ms. Hebert's home while outside working on his car. Looking up after hearing the first shot, he saw a window at the home "pulse" with the sound of the second and third shots. RP at 903. He went inside his home to call Ms. Hebert, telling Tashia when she answered that he wanted to make sure everything was okay. Tashia told him "something had exploded on the stove, that everything was all right, not to worry." RP at 904-05. When he asked to speak with Ms. Hebert, Tashia told him her mom was lying down and sleeping.

6

Mr. Rhodes then went across the street to speak with Ms. Amende and suggested she call Ms. Hebert to check on her. Ms. Amende called and again, Tashia answered the phone. Tashia told Ms. Amende that her mother was in the bathroom throwing up and that something had blown up on the stove, causing the smoke alarm to go off. Asked whether everything was okay, Tashia said yes. RP at 497. Asked to have her mother call Ms. Amende back, Tashia said she would.

Officer Kevin Erickson responded to the 911 call from Ms. Hebert's home, arriving within about 10 minutes. He knocked on the door and Tashia answered. Asked what was going on, Tashia—whom he described as acting upset or emotional—said that there was a "domestic" (the officer's terminology, we assume) over something that had burned on the stove, someone was sick, and "everybody was all upset." RP at 332. When the officer told her he needed to talk to her more about what was going on, Tashia stated she first needed to put her dogs away and shut the door.

Officer Erickson waited for Tashia to return to the door and speak to him for what he estimates to be more than two minutes, which he described as "a little unusual." RP at 333. While he waited, Mr. Rhodes called to him from across the street and the officer walked over and spoke with him. The officer then called for backup and began walking back to the Hebert home, at this point unsnapping the holster of his gun. As he came within 10 feet of the front door, Tashia flung it open and said, "She came at me with an

7

ax." RP at 335. When Officer Erickson said her neighbor reported gunshots, Tashia admitted that she had shot someone.

They proceeded inside to the living room, and backup officer Dean Perry arrived. Officer Perry stayed with Tashia and her daughter, S., in the living room, while Officer Erickson went to check on Ms. Hebert, who was lying inside her bedroom doorway. He could not feel a pulse. He observed what he would later describe as an inexpensive utility hatchet lying next to Ms. Hebert's body on the floor. Paramedics who responded moments later confirmed she was dead.

Tashia was taken to the police station and was questioned by Detective Bradley Gregory. She claimed to have been awakened that morning by her mother screaming at her about unauthorized withdrawals from her bank account. Tashia told the detective she reminded her mother that she gave Tashia a debit card and told her to withdraw money, but her mother did not believe her. According to Tashia, her mother called Mr. Hebert and told him she was going to have Todd arrested. Tashia told the officer that she, too, called Mr. Hebert that morning and remembered saying to him, "what do I do if she comes after me?" Ex. 375, at 26 min., 29 sec. through 26 min., 33 sec. (audio recording of police interview).

According to Tashia, at the same time she was trying to calm her mother down, she asked her mother to get a folder containing Tashia's birth certificate out of Ms. Hebert's safe. Todd had moved out two days earlier, and Tashia told her mother she

8

wanted to make sure he had not taken her birth certificate. Tashia told the detective that she stood in her mother's bathroom while her mother opened the safe to retrieve the folder. The bathroom is off the master bedroom and is the route to the closet where the safe is located. Tashia said that while opening the safe to get the folder, Ms. Hebert continued to "bitch[ ]" at Tashia. Ex. 375, at 52 min., 7 sec. through 52 min., 8 sec. According to Tashia, when her mother turned around from the safe she was holding not only the folder but also a "black thing" that she swung at Tashia, trying to hit her. Ex. 375, at 57 min., 6 sec. through 57 min., 18 sec.; 57 min., 54 sec. through 58 min., 10 sec.

Tashia said she took refuge in the closet where she claims to have seen her mother's .357 magnum revolver in the safe. Returning to her mother's bedroom, Tashia pointed the revolver at Ms. Hebert, who she said was coming at her from the hallway to the laundry room, still wielding the black thing. Tashia pulled the trigger and kept shooting until Ms. Hebert could no longer come after her. Tashia said that at some point as she fired, her mother lost hold of the black thing, which fell, striking her mother in the head.

Asked why she did not mention any of this to the 911 dispatcher, or Mr. Rhodes, or Ms. Amende, or Officer Erickson on his arrival, Tashia explained that she didn't know who the woman caller (the dispatcher) was; and, as explained to the neighbors, she needed to get off the phone so she could shut off the smoke detector. Finally, she said she needed Officer Erickson to stay outside until she could put her dogs away.

9

Questioned further about her initial interaction with Officer Erickson, she said she did not want him hurting her dogs. At another point in the interview, she said she was afraid that her mother, who she believed might have suffered only minor injury, would have her arrested.

Tashia admitted to the detective that before the shooting occurred, she had closed her daughter in another room and turned the volume up on the television so that her daughter could not hear what was going on. She later said that by "what was going on," she only meant Ms. Hebert screaming at her.

During the interview, the detective told Tashia that he had received information that Ms. Hebert kept her .357 magnum in her truck, not in her safe, and that since Tashia had borrowed her mother's truck the day before, she had access to the gun well before the shooting. Tashia denied having the gun before being assaulted by her mother. But trial testimony and crime scene photos later established that the case for the .357 magnum was found on the backside base of the living room couch.

Within a few days, the State charged Tashia with aggravated first degree murder under RCW 9A.32.030(1)(a). It later amended the information to charge her with attempted first degree murder on February 20, the day the tub of books struck Ms. Hebert in the garage, and with a number of aggravating factors.

Before trial, Tashia moved to exclude all of Ms. Hebert's statements about fear and suspicion of Tashia and Todd. The trial court found that only a couple of the

statements were admissible as excited utterances or evidence of state of mind, as argued by the State.

Later, the State argued that all of Ms. Hebert's statements of suspicion and fear were admissible under the doctrine of "forfeiture by wrongdoing," which it argued was not only an exception to the confrontation clause but also a waiver of the hearsay rule. Citing information provided by Tashia's daughter, S., it made an offer of proof that S. had learned how to open the safe; showed her mother; and, according to S., "when Ms. Hebert found out that [Tashia] had accessed the safe and that money was missing, she called the police." Clerk's Papers (CP) at 959. The State argued that the 911 hangup call and the fact that the safe was open when officers viewed the crime scene supported its theory that Tashia killed her mother to prevent her from reporting Tashia's theft. The trial court granted the State's motion and allowed it to present evidence of all of Ms. Hebert's statements to friends and family summarized above.

During the one-month trial, the parties offered competing forensic evidence, although both sides agreed that Ms. Hebert had been struck by only two of three shots fired by Tashia. Both sides agreed that the fatal shot was to Ms. Hebert's left chest, lodging in her spinal column after passing through her thumb, a folder she was clutching, and her chest cavity. Both agreed she suffered a chop wound on the back of her head that could have been caused by the hatchet found near her body.

11

A defense expert testified that Ms. Hebert's position on the ground, what looked on crime scene photographs to be human tissue on the face of the hatchet blade, and the direction and amount of blood flow from her head wound, were all consistent with Ms. Hebert having the hatchet in her right hand, above her head and in motion, when she suffered the fatal shot. He acknowledged when cross-examined that by the time he got the hatchet "there was very little on it," so he was never able to confirm that there was any human tissue on the face of the blade. RP at 1934. The State discounted the significance of any human tissue that might have been on the face of the blade, arguing, based on testimony of the crime scene investigator, that it would mean only that the hatchet had been "somewhere part of the event." RP at 2256.

Detective Bill Parramore testified to items found in executing a search warrant for Ms. Hebert's home. They included a copy of Ms. Hebert's handwritten will found between the mattresses in Tashia's room. Detective Mike Boettcher, a computer forensic specialist, identified a video of Ms. Hebert's safe that had been taken on the afternoon of February 14, 2011, using Tashia's cellular phone, which she had apparently placed in Ms. Hebert's closet. The State argued that Tashia placed the phone as a hidden camera to capture the combination to Ms. Hebert's safe. Finally, the State offered evidence that in February 2011, Tashia performed an Internet search on how to crack a safe. *See* Ex. 365 (showing Internet searches titled "safe drill points," "coded safes," "master code safe digital," and a website with the title "Illegal Engineering" discussing safe breaking).

12

Mr. Hebert was one of the last witnesses called by the State. Before trial, the defense expressed concern that Mr. Hebert believed Tashia murdered her mother and might express his belief during testimony. During direct examination, Mr. Hebert twice volunteered objectionable and prejudicial testimony that went beyond the prosecutor's questions and violated pretrial rulings, leading the defense to object and move for a mistrial. While the trial court denied the motion, it agreed to instruct the jury to disregard the testimony and imposed $200 in sanctions on the prosecutor. It acknowledged the prosecutor had not elicited the testimony but stated "this is not, in this court's opinion, the first time that we've had situations where I believe that the State should have advised their witnesses more specifically regarding the court's ruling." RP at 1724.

The jury found Tashia guilty of first degree murder and attempted first degree murder of her mother. In special verdicts, it found that Tashia was armed with a firearm in committing the murder and that her offenses were domestic violence offenses, committed with deliberate cruelty, within sight or sound of a minor child, and involved a destructive and foreseeable impact on persons other than the victim.

At sentencing, the trial court imposed a total sentence of 540 months' imprisonment. After Tashia answered "no" when asked by the court if there was any reason she would not be able to work upon release, including physical limitations that would prevent her from working, the court imposed legal financial obligations of

13

$181,825. Most of the amount was the cost of her court-appointed lawyers and retained experts and investigators. Tashia appeals.

## ANALYSIS

### I. Evidence admitted on the basis of "forfeiture by wrongdoing"

#### *A. Confrontation clause*

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. In practice, this ordinarily means that if the State wishes to present a witness's prior testimonial statements at trial, the witness must be truly unavailable and the defendant must have had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 59, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). But the confrontation right is subject to forfeiture, *see id.*, and it was "forfeiture by wrongdoing," recognized by our Supreme Court in *State v. Mason*, 160 Wn.2d 910, 926, 162 P.3d 396 (2007) and clarified by the United States Supreme Court in *Giles v. California*, 554 U.S. 353, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008), that the State argued made Ms. Hebert's statements admissible.

The confrontation clause does not apply, however: Ms. Hebert's statements to her family and friends were not "testimonial." "In general, where the statement is functionally trial testimony, it is testimonial; where it is just a casual statement made to a friend, it is nontestimonial." *State v. Wilcoxon*, 185 Wn.2d 324, 332, 373 P.3d 224, *cert.*

14

*denied*, 137 St. Ct. 580, 196 L. Ed. 2d 455 (2016) (citing *Crawford*, 541 U.S. at 51).

"Only after a court conclude[s] that a given statement is testimonial [does] it proceed to analyze the confrontation clause." *Id.* None of Ms. Hebert's challenged hearsay was functionally trial testimony. No confrontation issue is presented.

## B. Hearsay exception

It was not entirely clear at the time of Tashia's trial whether the forfeiture by wrongdoing exception to the confrontation right would prove to be an exception to hearsay's inadmissibility under ER 802. This court avoided deciding the issue in *State v. Fallentine*, 149 Wn. App. 614, 623 n.34, 215 P.3d 945 (2009). In May 2012, this court held that a defendant who forfeits his confrontation right by wrongdoing also waives a hearsay objection, but the Washington Supreme Court accepted review of the decision, and review was pending at the time of Tashia's trial. *State v. Dobbs*, 167 Wn. App. 905, 917-18, 276 P.3d 324 (*Dobbs* I), *review granted*, 175 Wn.2d 1013 (2012).

In deciding *Dobbs* I, this court relied on the observation of the United States Supreme Court in *Giles* that before the founding of our country, courts excluded hearsay evidence in large part because it was unconfronted. *Id.* at 917 (citing *Giles*, 554 U.S. at 365). *Giles* did not offer that historical observation as a basis for recognizing an exception to modern hearsay rules, however, but only to explain why it rejected the State's effort to distinguish 18th and 19th century common law as based on confrontation rather than hearsay grounds. *Giles*, 554 U.S. at 365.

15

Unlike the federal courts,[3] Washington's Supreme Court did not provide in our evidence rules for a forfeiture by wrongdoing hearsay exception until July 10, 2013. *Crawford*, 177 Wn.2d at 1103, 1302. And that rule change would not become effective until September 1, 2013. *Id.* Both were too late for Tashia's May-June 2013 trial.

With its 2014 decision in *Dobbs* II, our Supreme Court recognized a common law hearsay exception applicable before the effectiveness of ER 804(b)(6). *State v. Dobbs*, 180 Wn.2d 1, 17 & n.2, 320 P.3d 705 (2014) (*Dobbs* II). The trial court had been right in relying on a hearsay waiver assuming the forfeiture by wrongdoing doctrine applied. Thus, we arrive at the interesting question of whether the forfeiture by wrongdoing-related hearsay exception *did* apply on these facts.

In *Giles*, the Supreme Court held that in the "typical murder case involving accusatorial statements by the victim" the forfeiture by wrongdoing doctrine does *not* apply, because prior to the founding, the doctrine was limited to cases where it could be shown that the defendant intended to prevent a witness from testifying. 554 U.S. at 361-62. "[T]he exception applied only when the defendant engaged in conduct *designed* to

---

[3] In 1997, the forfeiture by misconduct doctrine was codified as an exception to the federal hearsay rule in Rule 804(b)(6) of the Federal Rules of Evidence. Even before that, an exception for such hearsay had been widely permitted under the federal residual exception to the hearsay rule. *United States v. Zlatogur*, 271 F.3d 1025, 1028 (11th Cir. 2001).

16

prevent the witness from testifying," "requir[ing] the witness to have been 'kept back' or 'detained' by 'means or procurement' of the defendant." *Id.* at 359-60.

What the Supreme Court did not say in *Giles* but seems obvious is that it is nonsense to say that a defendant's purpose in committing a murder is to prevent the victim's incriminating hearsay from being admitted in the murder trial. There is an obvious and simpler way to avoid admission of the victim's hearsay in the murder trial: do not commit the murder. Common sense tells us that murder will always be actuated by something other than preventing the victim's testimony at the murder trial.

Nonetheless, the State contended that Tashia's prosecution was an atypical murder case implicitly contemplated by *Giles*, which spoke of the "typical" murder case. *Id.* at 361. It relied on its offer of proof that the murder was committed to prevent Ms. Hebert from reporting and testifying to Tashia's theft and thereby was "designed to prevent the witness from testifying." This would be more persuasive if Tashia were being prosecuted for theft. But should the State be able to bootstrap Tashia's action to procure her mother's silence on the issue of theft into a basis for admitting hearsay relevant to the murder? Such evidence is not admitted in other murder cases actuated by equally evil motives.

If the hearsay exception is intended to mirror the application of the forfeiture by wrongdoing doctrine, we seriously question whether it applies in any prosecution for murder. As discussed both in *Giles* and in our Supreme Court's decision in *Dobbs*, a

17

principal reason for the forfeiture by wrongdoing doctrine was to remove the incentive

for defendants to engage in conduct designed to prevent a witness from testifying:

> The absence of a forfeiture rule covering this sort of conduct would create
> an intolerable incentive for defendants to bribe, intimidate, or even kill
> witnesses against them. There is nothing mysterious about courts' refusal
> to carry the rationale further.

*Giles*, 554 U.S. at 365; *accord Dobbs* II, 180 Wn.2d at 17 ("If such wrongdoing did not

result in a waiver of hearsay objections, a defendant would have a perverse incentive to

use threats, intimidation, or violence to prevent a witness from coming to court."). As we

have already observed, it is nonsense to think that preventing the murder victim's

statements from being used at the trial for her murder would ever be *the purpose* for a

murder.

The parties have not focused on this distinction. We are reluctant to decide the

issue without better developed briefing. Perhaps some atypical murder case *was*

contemplated in *Giles*. We need not decide the issue because the jury's verdict can be

affirmed on the basis of harmless error.

The nonconstitutional harmless error standard applies, since the possible error was

a ruling on hearsay, not confrontation. It is therefore incumbent on Tashia to demonstrate

that within reasonable probabilities, the outcome of her trial would have been materially

affected had any error in admitting the hearsay not occurred. *State v. Barry*, 183 Wn.2d

297, 317-18, 352 P.3d 161 (2015).

18

Tashia does not challenge the trial court's ruling to admit, as an excited utterance, Ms. Hebert's contemporaneous conversation with her ex-husband about the circumstances of her injury by the falling tub. Evidence of medical treatment for Ms. Hebert several days after the injury was also admitted. Tashia's statements to Mr. Adney were nonhearsay admissions under ER 801(d)(2). Tashia does not challenge the trial court's ruling that Ms. Severin could testify, on "state of mind" grounds, about the conversations in which she and Ms. Hebert had come up with the code word "[l]avender" should Ms. Hebert need police protection from Tashia or Todd.

Jurors could easily have viewed Tashia's explanation to Detective Gregory of the circumstances of the shooting as implausible. Her dishonesty with the four individuals who spoke to her in the immediate aftermath of the shooting may have been the most damning evidence of all. With all of that, and the considerable evidence of Tashia's efforts to obtain access to her mother's safe, nothing more was needed for jurors to find guilt beyond a reasonable doubt. Tashia does not show that within reasonable probabilities the outcome of the trial would have been different had the challenged hearsay been excluded.

## II. Legal financial obligations

For the first time on appeal, Tashia complains that the trial court did not engage in a sufficiently individualized inquiry into her present or future ability to pay the substantial legal financial obligations (LFOs) it imposed. Under RCW 10.01.160(3),

19

"[t]he court shall not order a defendant to pay costs unless the defendant is or will be able to pay them." *State v. Blazina*, 182 Wn.2d 827, 838, 344 P.3d 680 (2015) (emphasis omitted). The court did ask if Tashia would be able to work upon her release and she answered, unqualifiedly, that she would. Her trial lawyer's only objection to the costs imposed was that he had not been able to confirm the cost figures submitted to the court and that when restitution was determined (which would happen later), Tashia would object to restitution for burial costs that she believed were covered by insurance.

Evidence of ability to pay was unnecessary to support the mandatory financial obligations imposed by the court. *State v. Lundy*, 176 Wn. App. 96, 102, 308 P.3d 755 (2013) (for these costs, "the legislature has directed expressly that a defendant's ability to pay should not be taken into account"). With respect to the legal financial obligations that were discretionary, Tashia made no objection at the sentencing hearing and thereby failed to preserve a claim of error. RAP 2.5(a); *Blazina*, 182 Wn.2d at 832-33.

We enjoy discretion to review Tashia's argument that the trial court failed to comply with RCW 10.01.160(3) but decline to do so. Her 540-month sentence means it will be decades before the LFOs imposed can hinder her reentry into society. LFO reform could easily occur during that time frame. When she is released, the extent to which her costs should be remitted can be determined under then-current criteria.

20

III. Cross appeal of sanctions

The State challenges the $200 sanction imposed on the prosecutor. Trial courts have "the inherent authority to sanction lawyers for improper conduct during the course of litigation." *State v. Merrill*, 183 Wn. App. 749, 755, 335 P.3d 444 (2014). We review a trial court's decision to impose sanctions for an abuse of discretion. *Id.*

The State argues that such a sanction "generally requires an explicit finding of bad faith." Resp't Brief and Cross Appeal at 39. But our Supreme Court has rejected arguments that trial courts must make express findings of bad faith to support a sanction. *State v. Gassman*, 175 Wn.2d 208, 211, 283 P.3d 1113 (2012). Instead, while explaining that it is best practice to make the finding expressly, appellate courts may uphold sanctions "where an examination of the record establishes that the court found some conduct equivalent to bad faith." *Id.* Thus in *State v. S.H.*, 102 Wn. App. 468, 470, 8 P.3d 1058 (2000), which the State cites as support for its challenge, the sanction was reversed because the "basis for the imposition of sanctions [was] not clear," and the record suggested that the State had merely been careless. *Gassman*, 175 Wn.2d at 213.

Here, the basis for the court's sanction is clear. For pretrial rulings on excluded evidence to be effective, lawyers for the parties must do more than refrain from intentionally eliciting the excluded evidence. They must take steps to prevent their witnesses from unwittingly violating the court's rulings. This includes advising witnesses of subject matters that are foreclosed. In imposing the sanction, the trial court

21

identified conduct equivalent to bad faith: "[T]his is not . . . the first time that we've had situations where I believe the State should have advised their witnesses more specifically regarding the court's ruling." RP at 1724. No one is in a better position to perceive such a problem than the trial court.

The State does not attempt to demonstrate that the trial court was wrong about the pattern it perceived in the month-long trial. It merely argues that the prosecutor did not elicit the problematic evidence and that the trial court did not use the words "bad faith" when it imposed the sanction. That is not enough to demonstrate abuse of discretion.

We affirm the convictions and the sanction. Tashia has complied with our general order on documenting continued indigency for appellate cost purposes. Based on review of her submission, we exercise our discretion to deny costs on appeal to the State.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, C.J.

22