
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36428-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TIMOTHY BRYANT BLOCHER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Timothy Blocher appeals convictions of three counts of felony violation of a no-contact order and two counts of bail jumping. We affirm his convictions for felony violation of a no-contact order, reverse his convictions for bail jumping, and remand for resentencing.

FACTS AND PROCEDURAL BACKGROUND

Timothy Blocher was romantically involved with Jeanne Malinosky for a time but it ended badly, and Ms. Malinosky obtained a no-contact order against Mr. Blocher in November 2015. He violated the order several times. An April 2016 violation—his third—was charged in Kittitas County Superior Court cause no. 16-1-00102-4 (hereafter "the 102-4 matter"). Ms. Malinosky's report of additional violations in August 2016 led to the four felony violations charged below.

The charges in this case were filed after Ms. Malinosky called police to report that Mr. Blocher had contacted her through Facebook, a social media platform. Ellensburg Patrol Officer Josh Ingraham confirmed that the no-contact order in place against Mr. Blocher prohibited electronic communication and responded to her complaint.

Officer Ingraham used Ms. Malinosky's cell phone to look at her news feed,[1] which contained an August 3 notification of a Facebook group called "Hope you guys are alright!" whose members were initially Ms. Malinosky, "Timothy Bryant Blocher," and Don Glenn, a mutual friend of Ms. Malinosky's and Mr. Blocher's. Her news feed included several postings to the group thereafter, as well as a notification that Mr. Glenn left the group on August 4. Ms. Malinosky claimed she had not joined the "Hope you guys are alright!" Facebook group and later testified it had just "pop[ped] up on [her] screen." Report of Proceedings (RP) at 328.

Officer Ingraham took several photographs as he scrolled through messages and postings in Ms. Malinosky's news feed. The officer also phoned Mr. Blocher, who confirmed that "Timothy Bryant Blocher" and the profile picture that appeared in the

---

[1] Facebook uses the term "news feed" to describe a constantly updating list of status updates, photos, videos, links, app activity, and likes from people, pages and groups that a user follows on Facebook. *See How News Feed Works*, FACEBOOK, https://www.facebook.com/help/1155510281178725 [https://perma.cc/A3S9-LZN2].

group posts in Ms. Malinosky's news feed were the name and profile picture Mr. Blocher

used on Facebook.

Based on the information provided by Ms. Malinosky and obtained from her

cellphone, the State charged Mr. Blocher with the following four counts of violating the

no-contact order:

| | Date of offense | Offense conduct |
|---|---|---|
| Count 1 | August 3, 2016 | Setting up a Facebook group, "Hope you guys are alright!" and establishing himself, Ms. Malinosky, and Don Glenn, a mutual friend, as group members |
| Count 2 | August 3, 2016 | Posting song lyrics to the group |
| Count 3 | August 4, 2016 | Posting "miss ya" to the group |
| Count 4 | August 5, 2016 | Posting a thumbs-up emoji to the group |

Clerk's Papers (CP) at 1-2.

Mr. Blocher's trial dates in this matter and the 102-4 matter were continued many

times for several reasons. One reason was medical care for a severe bone infection Mr.

Blocher suffered in his toes and foot. On February 27, 2018, the 102-4 matter proceeded

to a two-day jury trial at the conclusion of which he was found guilty as charged. On

February 28, following the jury's verdict, the trial court set the sentencing in that matter

for March 5, 2018, and ordered that this case would also be called on that date.

At the outset of proceedings on March 5, the lawyers notified the trial court that

Mr. Blocher, who had been in jail on City of Ellensburg charges pending in district court,

had been taken to the emergency room and then transferred to Harborview Medical Center.  The prosecutor reported that the district court released Mr. Blocher with an order to contact the probation office when he was released from Harborview.  Based on defense counsel's report that he expected Mr. Blocher to be in the hospital for a couple of weeks, the trial court granted the defense request to continue this matter and the 102-4 matter for three weeks, to March 26.

When the trial court called Mr. Blocher's case on March 26, Mr. Blocher was absent.  His lawyer told the court:

> I confirmed with Dr. Fiorito's nurse this morning that Mr. Blocher is still at Harborview.  I—*Mr. Blocher doesn't know about this hearing today*.  He has been okay at calling me and left a message last Monday.  I tried to— tried to call him on Wednesday and today the phone that he's got in his room doesn't have a message thing.

RP at 193 (emphasis added).  The trial court issued bench warrants requested by the prosecutor, who complained that Mr. Blocher had a history of not following court orders.

Months later, in August 2018, Mr. Blocher appeared in court and the bench warrant issued following the March 26 hearing was quashed.  The prosecutor and a probation officer informed the court that Mr. Blocher had been receiving treatment and medical monitoring off and on during the prior several months, but there were times

when he was released from medical care and could have contacted his probation officer, but failed to do so.[2]

Mr. Blocher's lawyer responded that his client had "kept in very consistent contact with me," although he told the court again, as he had on March 26, that "as far as when the warrant was issued last March, he didn't know about that date." RP at 201. He added, "I hope I don't have to become a witness in the . . . case; but I—I certainly will." *Id*. At the hearing's conclusion, the trial court ordered Mr. Blocher held without bail in the 102-4 matter and held on $100,000 bail in this matter. It set sentencing in the 102-4 matter for the following week and set the charges in this case for a status hearing and trial in October.

At or shortly after that August hearing, the State evidently informed Mr. Blocher's lawyer that it would move to add a charge of bail jumping for Mr. Blocher's failure to appear on March 26. On September 4, Mr. Blocher's lawyer moved for leave to withdraw as counsel, for the reason that he "had not advised Mr. Blocher of the court date" and "is a witness to the charge of Bail jumping." CP at 161. The court granted the

---

[2] The probation officer, to whom Mr. Blocher was assigned on his city charges, reported to the court that Mr. Blocher had been at Harborview from March 2 to April 2, when he left against medical advice. He had been readmitted to Harborview on April 10 and released on April 13, and was admitted to the University of Washington on April 30 until about the beginning of June, when he was released to home. The probation officer stated that she had made it very clear to Mr. Blocher's lawyer that he needed to contact her upon any release from the hospital, and "I have not heard from Mr. Blocher at all." RP at 206.

motion and appointed new counsel for Mr. Blocher. The State thereafter amended the information to add two charges of bail jumping for the nonappearance on March 26: one count for the nonappearance in the 102-4 matter and another for the nonappearance in this case.

This case proceeded in October to a two-day jury trial. The State called Ms. Malinosky and Officer Ingraham as witnesses to the no-contact order violation charges. It called the Kittitas County deputy clerk to testify to Mr. Blocher's absence from court on March 26, and to his presence in court on February 28, 2016, when he was ordered to appear in court on March 5 in this matter and the 102-4 matter. When cross-examined, the clerk admitted that she did not know whether Mr. Blocher knew about the March 26 hearing. She admitted that according to court minutes, his lawyer claimed Mr. Blocher was in the hospital that day.

Mr. Blocher was the sole defense witness. He testified that he had not communicated with Ms. Malinosky since January 2016. He told jurors that his and Ms. Malinosky's mutual friend, Don Glenn, started the "Hope you guys are alright!" Facebook group in 2014, and included the two of them as members. Mr. Blocher testified that he believed he posted the lyrics that appeared on Ms. Malinosky's phone on August 3, but he had been posting them for Mr. Glenn. He said he did not specifically recall posting to the Facebook group, but he would not have expected Ms. Malinosky to see the post if he had: he claimed he had "unfriended" her on Facebook in January 2016

6

and "blocked" her sometime thereafter. RP at 429. Mr. Blocher testified that the "miss ya" message was also meant for Mr. Glenn. As for the thumbs up emoji, Mr. Blocher testified he inadvertently sent that message when turning off his phone.

The jury found Mr. Blocher guilty of the first three counts of violating the no-contact order and acquitted him of the fourth. It answered no to special verdicts asking if Mr. Blocher and Ms. Malinosky were members of the same household. It found Mr. Blocher guilty of both bail jumping charges.

At sentencing, Mr. Blocher moved the court to arrest judgment of the bail jumping counts on grounds there was no evidence he knew his appearance was required on March 26. Mr. Blocher's lawyer explained that he could have called Mr. Blocher's prior lawyer to testify that Mr. Blocher was unaware of the March 26 date, but stated, "[W]hy would I need to? The State had absolutely failed to meet its burden." RP at 545. After reviewing the to-convict instruction and hearing the arguments of counsel, the trial court concluded that it was enough for the State to prove that Mr. Blocher was released with knowledge of the requirement of an appearance on March 5.

The State asked the trial court to run Mr. Blocher's sentence in this matter consecutive to his sentence in the 102-4 matter, while the defense asked for the sentences to run concurrently. Following both requests, the following exchange occurred:

> THE COURT: . . . I have one question for Ms. Hammond. You—when you were presenting your argument a moment ago you made it sound like I can't impose—that there was a legal impos—a legal prohibition of me

7

imposing concurrent sentence. Did I mishear that? Were you saying I should not—not that I cannot?

[PROSECUTOR] HAMMOND: I'm—I am saying that the law presumes that when somebody is sentenced on two different cause numbers on different dates the presumption is consecutive.

THE COURT: I think that's true.

[PROSECUTOR] HAMMOND: And not that you can't order concurrent sentences; but the law presumes that they're consecutive.

RP at 558.

The court sentenced Mr. Blocher to a total of 41 months with credit for time served and stated that the sentence would run consecutive to the sentence in the 102-4 matter. Mr. Blocher appeals.

ANALYSIS

Mr. Blocher makes seven assignments of error. We have reorganized them and address only those that are dispositive.

I.    THE STATE'S EVIDENCE OF THE ESSENTIAL "KNOWLEDGE" ELEMENT OF ITS BAIL JUMPING CHARGES WAS INSUFFICIENT

Several of Mr. Blocher's assignments of error challenge his bail jumping convictions. His challenge to the sufficiency of the evidence to prove the required knowledge element is dispositive.

Bail jumping has a knowledge element, but it falls short of intentional failure to appear. RCW 9A.76.170(1) defines the crime of bail jumping:

Any person having been released by court order or admitted to bail with knowledge of the requirement of a subsequent personal appearance before

8

any court of this state . . . and who fails to appear . . . as required is guilty of bail jumping.

The knowledge element the State must prove is that the defendant was "released . . . or admitted to bail with knowledge of the requirement of a subsequent personal appearance." *Id.*

The State is not required to prove that when the hearing date arrives, the defendant still has it in mind. *See State v. Ball*, 97 Wn. App. 534, 536-37, 987 P.2d 632 (1999) (finding knowledge where defendant signed a document that set the date for his next court appearance). "'I forgot' is not a defense to the crime of bail jumping." *State v. Carver*, 122 Wn. App. 300, 306, 93 P.3d 947 (2004). The State must prove that a defendant has been given notice to appear at his required court dates, however. *State v. Cardwell*, 155 Wn. App. 41, 47, 226 P.3d 243 (2010) (citing *State v. Fredrick*, 123 Wn. App. 347, 353, 97 P.3d 47 (2004)); *cf. State v. Bryant*, 89 Wn. App. 857, 870, 950 P.2d 1004 (1998) ("[B]ail jumping is not a per se offense. The State must prove beyond a reasonable doubt that Bryant knew, or was aware that he was required to appear at the hearing on December 8, 1994.").

"'The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt.'" *State v. Witherspoon*, 180 Wn.2d 875, 883, 329 P.3d 888 (2014) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d

1068 (1992)). A defendant's claim of insufficient evidence admits the truth of the State's evidence and "'all inferences that reasonably can be drawn [from it].'" *State v. Condon*, 182 Wn.2d 307, 314, 343 P.3d 357 (2015) (alteration in original) (quoting *Salinas*, 119 Wn.2d at 201). For a fact finder to reasonably draw inferences from proven circumstances, the inference must be rationally related to the proven fact and reason and experience must support the inference. *State v. Bencivenga*, 137 Wn.2d 703, 707, 974 P.2d 832 (1999). "'A presumption is only permissible when no more than one conclusion can be drawn from any set of circumstances.'" *Id.* at 708 (quoting *State v. Jackson*, 112 Wn.2d 867, 876, 774 P.2d 1211 (1989)).

In the 10 years since *Cardwell* was decided, this court has repeatedly applied its holding that to prove bail jumping, the State must prove a defendant was given notice of the required court date. *E.g., State v. Boyd*, 1 Wn. App. 2d 501, 517, 408 P.3d 362 (2017) (order stating defendant's presence was required on a particular date, signed by defendant, was sufficient evidence).[3] The State cites no authority to the contrary. The

---

[3] *And see State v. Chappelle*, No. 63416-0-I, 2011 WL 2775591 at *5, noted at 162 Wn. App. 1044 (2011) (*evidence that defendant signed an order requiring him to appear on January 22, 2008, was insufficient to prove bail jumping on January 23; no evidence was presented that defendant knew his case had been held over for a day*); *State v. Johnson*, No. 51227-1-II, slip op. at 4 (Wash. Ct. App. Aug. 7, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2051227-1-II%20Unpublished %20Opinion.pdf; *State v. Leffler*, No. 49788-3-III, slip op. at 12 (Wash. Ct. App. Jan. 23, 2019) (unpublished) (*order setting a date for trial, signed by defendant, was sufficient evidence*), https://www.courts.wa.gov/opinions/pdf/D2%2049788-3-II%20Unpublished %20Opinion.pdf; *State v. Clark*, No. 44642-1-II; slip op. at 12-13, (Wash. Ct. App. Dec.

closest decision for the State, but ultimately not persuasive on these facts, is Division

Two's unpublished decision in *State v. Johnson*, in which the State's witness on the bail

jumping charge—the prosecutor who was present at the defendant's arraignment—

testified that Johnson's defense attorney was "good about" providing copies of court

orders to his clients and, while the prosecutor did not specifically recall that happening at

Johnson's arraignment, he could not recall a time when defense counsel did *not* provide a

client with an order. No. 51227-1-II, slip op. at 4 (Wash. Ct. App. Aug. 7, 2018)

(unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2051227-1-II

%20Unpublished%20Opinion.pdf. The Division Two panel found that evidence to be

sufficient.

Here, the State offered no evidence that it was the practice of the lawyer

representing Mr. Blocher in March 2016, to notify his clients of court dates. It could not

have offered such evidence, knowing as it did that the lawyer had twice stated that he did

*not* inform Mr. Blocher of the date—and even withdrew as counsel in order to testify as a

defense witness. Without more, proof that a lawyer was aware of an appearance date is

not circumstantial evidence that his or her client was aware of the appearance date.

---

30, 2014) (unpublished) (*evidence that trial court's usual practice was to notify
defendants of court date when set was sufficient*), https://www.courts.wa.gov/opinions
/pdf/D2%2044642-1-II%20Unpublished%20Opinion.pdf.

Under GR 14.1, unpublished opinions have no precedential value, but may be
cited as nonbinding authorities and accorded such persuasive value as the court deems
appropriate.

The State's suggestion that a defendant who fails to appear for one required court date can be guilty of bail jumping for failing to appear, without notice, on a continued date, is not supported by statutory language. RCW 9A.76.170(1) makes it a crime for a person to fail to appear if he or she has knowledge of "*the* requirement of *a* subsequent personal appearance"—not general knowledge that once charged, future court appearances will be set and, if necessary, reset. There is no textual basis in RCW 9A.76.170(1) for making it the duty of a criminal defendant, on penalty of committing a felony, to determine his or her next required court appearance.

Because insufficient evidence supports Mr. Blocher's knowledge of the requirement that he appear on March 26, the bail jumping convictions must be reversed.

II. THE STATE PRESENTED SUFFICIENT EVIDENCE THAT THE CONTACT WITH MS. MALINOSKY CHARGED AS COUNT ONE WAS A NO-CONTACT ORDER VIOLATION, AND DISTINCT FROM THE VIOLATION CHARGED AS COUNT TWO

Mr. Blocher argues for the first time on appeal that creating a Facebook group that included Ms. Malinosky was not a violation of the no-contact order; alternatively, he argues that the count one charge for creating the group cannot be distinguished from the count two charge for posting lyrics, and convictions on both counts constitute double jeopardy. In support he states, conclusorily, that "[a]dding a person's name to a [Facebook] group does not indicate that there has been a communication" and "the creation of the group and the posting of the song lyrics are so interrelated as to constitute a single offense." Br. of Appellant at 21, 23.

12

Violation of a no-contact order "has three essential elements: 'the willful contact with another; the prohibition of such contact by a valid no-contact order; and the defendant's knowledge of the no-contact order.'" *State v. Washington*, 135 Wn. App. 42, 49, 143 P.3d 606 (2006) (quoting *State v. Clowes*, 104 Wn. App. 935, 944, 18 P.3d 596 (2001)); *see also* RCW 26.50.110; RCW 10.99.050(2)(a).

At trial, Mr. Blocher did not contend that creating a Facebook group and making the first post to the group would be a single act, constituting a single contact. *See* RP 512. His theory at trial was that the "Hope you guys are alright!" group was created by Mr. Glenn in 2014, and when Mr. Blocher used the already-created group to communicate with Mr. Glenn, he did not believe that Ms. Malinosky would receive the posts. Given that defense theory, witnesses were not examined about the lapse of time, if any, between what the State contended was Mr. Blocher's creation of the Facebook group on August 3, 2016, and the posting of the lyrics that occurred on the same day. Neither lawyer spent much time having Ms. Malinosky or Officer Ingraham explain the acts on Mr. Blocher's end or the perceptions on Ms. Malinosky's that made them two distinct contacts.

Given the defense theory at trial, there was not *much* evidence on these matters, but there was enough. Ms. Malinosky testified that when groups are created on Facebook, "[T]hey will pop up on your message feed." RP at 286. She identified the State's exhibit 7 as a photograph of a group page that appeared in her Facebook account

13

for the "Hope you guys are alright!" group, identifying the members (after Mr. Glenn left the group) as herself and Mr. Blocher.  In cross-examining Ms. Malinosky, Mr. Blocher's lawyer elicited her confirmation that "according to [her] phone" Mr. Blocher created the group on August 3, as well as her testimony that "[y]ou just all of a sudden you're in this group and then you can—you—it pops up on your screen and then you can leave the group."  RP at 315, 328.

The no-contact order imposed on Mr. Blocher prohibited him, among other things, from contacting Ms. Malinosky indirectly, through others, by electronic means.  As earlier explained, the test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt.  *Witherspoon*, 180 Wn.2d at 883.  Viewing the evidence in the light most favorable to the State, reasonable jurors could find that the creation of the Facebook group, in and of itself, caused a notification to appear in Ms. Malinosky's news feed, and the posting of the song lyrics appeared separately.

Turning to Mr. Blocher's double jeopardy challenge, both the federal and state constitution "protect a defendant from being punished more than once for the same offense."  *State v. Sutherby*, 165 Wn.2d 870, 878, 204 P.3d 916 (2009); *see also* U.S. CONST. amend. V; WASH. CONST. art. I, § 9.  Protection from double jeopardy encompasses three aspects and Mr. Blocher invokes the third: a person cannot "receive multiple punishments for the same offense."  *State v. Villanueva-Gonzalez*, 180 Wn.2d

14

975, 980, 329 P.3d 78 (2014). An allegation that a conviction constitutes double jeopardy can be raised for the first time on appeal. *State v. Adel*, 136 Wn.2d 629, 631-32, 965 P.2d 1072 (1998). Claims of double jeopardy present questions of law that we review de novo. *State v. Hughes*, 166 Wn.2d 675, 681, 212 P.3d 558 (2009).

"When a defendant is convicted for violating one statute multiple times, the proper inquiry is 'what "unit of prosecution" has the Legislature intended as the punishable act under the specific criminal statute.'" *State v. Reeder*, 184 Wn.2d 805, 825, 365 P.3d 1243 (2015) (quoting *Adel*, 136 Wn.2d at 634). "The unit of prosecution for a crime may be an act or a course of conduct." *State v. Tvedt*, 153 Wn.2d 705, 710, 107 P.3d 728 (2005).

RCW 26.50.110(1) provides that when a person restrained by a no-contact order, knowing of the order, commits "*a* violation" of certain provisions, it is a gross misdemeanor. (Emphasis added.) RCW 26.50.110(5) makes such "*a* violation" a class C felony if the offender has at least two previous convictions for violating the provisions of a valid foreign protection order or an order issued under certain Washington statutes. (Emphasis added.) This court has long held that the unit of prosecution under RCW 26.50.110 is each individual prohibited contact. *State v. Allen*, 150 Wn. App. 300, 313, 207 P.3d 483 (2009); *State v. Brown*, 159 Wn. App. 1, 10-11, 248 P.3d 518 (2010). As this court observed in *Brown*, "The Supreme Court 'has consistently interpreted the legislature's use of the word "a" in a criminal statute as authorizing punishment for each

15

individual instance of criminal conduct, even if multiple instances of such conduct occurred simultaneously.'" *Id.* at 11 (quoting *State v. Ose*, 156 Wn.2d 140, 147, 124 P.3d 635 (2005)).

Since counts one and two charged separate instances of criminal conduct, Mr. Blocher's conviction for both did not constitute double jeopardy.

III.    IN RESENTENCING MR. BLOCHER, HIS SENTENCE IN THIS MATTER WILL
        PRESUMPTIVELY RUN CONCURRENTLY WITH HIS SENTENCE IN THE 102-4 MATTER,
        NOT CONSECUTIVELY

Finally, Mr. Blocher argues that the trial court erred when it stated it would run his sentence in this case consecutive to the sentence imposed in the 102-4 matter. He argues that under RCW 9.94A.589(3), the sentences presumptively run concurrently, with discretion in the court to impose consecutive sentences. He further argues that RCW 9.94A.589(3) is subject to RCW 9.94A.589(1), under which a court can impose consecutive sentences only under the exceptional sentence provisions of RCW 9.94A.535. We agree in part.

RCW 9.94A.589(3) applies "whenever a person is sentenced for a felony that was committed while the person was not under sentence for conviction of a felony." It applies here, since the no-contact violations were committed in August 2016, a time when Mr. Blocher had been charged in the 102-4 matter, but was not yet serving a sentence in that or any other felony matter. Under RCW 9.94A.589(3):

16

the sentence shall run concurrently with any felony sentence which has
been imposed by any court . . . subsequent to the commission of the crime
being sentenced unless the court pronouncing the current sentence
expressly orders that they be served consecutively.

The State argues on appeal that the trial court correctly applied the statute, since it

expressly ordered that Mr. Blocher's sentence run consecutive to that imposed in the 102-

4 matter. But when the court imposed consecutive sentences, it was being told by the

State that the sentences were presumptively consecutive. It is not clear that the trial court

would have done the same thing had it realized that the sentences were presumptively

concurrent.

Mr. Blocher also argues that under RCW 9.94A.589(1)(a), the court could impose

consecutive sentences only under the exceptional sentence provisions of RCW

9.94A.535. Here, we disagree. RCW 9.94A.589(1)(a) applies "whenever a person is to

be sentenced for two or more current offenses." "While the [Sentencing Reform Act of

1981, chapter 9.94A RCW,] does not formally define 'current offense,' the term is

defined functionally as convictions entered or sentenced on the same day." *In re Pers.*

*Restraint of Finstad*, 177 Wn.2d 501, 507, 301 P.3d 450 (2013). The convictions in the

102-4 matter were not entered or sentenced on the same day as the convictions in this

matter. RCW 9.94A.589(1)(a) does not apply.

STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds (SAG), Mr. Blocher raises three. The third relates to the bail jumping convictions, which we reverse. We address the first and second.

*Insufficient evidence.* Mr. Blocher contends the State failed to present sufficient evidence of the no-contact violations charged in counts 1, 2 and 3, because it failed to prove he knowingly contacted Ms. Malinosky or that he created the Facebook group.

The jury was correctly instructed that "[t]he law does not distinguish between direct and circumstantial evidence in terms of their weight or value," and that "circumstantial evidence" refers to "evidence from which, based on your common sense and experience, you may reasonably infer something that is at issue in this case." CP at 225. The jury received the following correct instruction on its role in weighing the evidence:

> You are the sole judges of the credibility of each witness. You are also the sole judges of the value or weight to be given to the testimony of each witness. In considering a witness's testimony, you may consider . . . the manner of the witness while testifying; any personal interest that the witness might have in the outcome or the issues; . . . the reasonableness of the witness's statements in the context of all of the other evidence; and any other factors that affect your evaluation or belief of a witness or your evaluation of his or her testimony.

CP at 221.

18

The jury was presented with evidence from which it could infer that Mr. Blocher created the Facebook group and knew that its creation would appear in Ms. Malinosky's Facebook news feed, as would messages posted to the group. Among that evidence was Ms. Malinosky's and Officer Ingraham's testimony and the content of the messages, which the jury could reasonably find were intended for Ms. Malinosky, not Mr. Glenn. The jury was not required to believe Mr. Blocher.

*Hearsay.* During trial, defense counsel objected to the photographs of the screen of Ms. Malinosky's cell phone on hearsay grounds. While the State argued that it was not offering the photographs for the truth of the content of the messages, the defense argued that the State was relying on language generated by Facebook that "Timothy Bryant Blocher created this group." Ex. P-8. Mr. Blocher argued that to admit the content generated by Facebook, the State would need to present a record custodian from Facebook to qualify the news feed copies as a business record.

Here, however, the content that Mr. Blocher found objectionable was not a statement made by a human being who could be cross-examined. Throughout the argument of Mr. Blocher's objection and during testimony it was agreed that the statement "Timothy Bryant Blocher created this group" would have been generated by computer code, not a Facebook employee. *See, e.g.*, RP at 299 (defense counsel characterizing the statement as made "by Facebook or Facebook's algorithm, or

19

whatever"); RP at 363 (Officer Ingraham testifying that the information was

"automatically generated.").

Our Supreme Court has described the reasons for the hearsay rule:

> Some of the reasons why hearsay evidence is not ordinarily admissible are, that the person quoted is not before the court and not subject to cross-examination, a right which all courts have held to be inviolate except in certain instances arising largely because of the necessities of the situation; that the person quoted was not under oath; and the probability that the person testifying has misunderstood, misinterpreted, or colored what had been told him. In other words, hearsay evidence is ordinarily refused by the courts because of the manifest inherent dangers in connection with it. . . . The appellants should have the right to search out these matters by means of cross-examination.

*State v. Gibson*, 115 Wash. 512, 513-14, 197 P. 611 (1921).

What is at issue when a statement such as the one at issue here is generated by

computer code is not truth, but design and accuracy. What was needed was not to

explore whether someone misunderstood, misinterpreted, or mischaracterized what they

were told, but to explore what triggered computer generation of the statement, "Timothy

Bryant Blocher created this group," and the other content Ms. Malinosky saw in her news

feed. Ms. Malinosky offered her inference, based on her experience with Facebook

groups, that such a message is generated when a group is created, and, in her experience,

it identifies the Facebook user who created the group. No objection was made under ER

701. Officer Ingraham offered his understanding as an expert qualified by experience

and training that such a message is generated when a group is created and identifies the

Facebook user who created the group. No objection was made under ER 702. While a software engineer from Facebook might be the gold standard to explain what triggered the generation of the statement in Ms. Malinosky's news feed, the State was not required to present the gold standard.

We reverse Mr. Blocher's convictions for bail jumping and remand for resentencing.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Lawrence-Berrey, C.J.

Pennell, J.